THE PEOPLE OF THE STATE OF NEW YORK ex rel. BING-HAMTON LIGHT, HEAT AND POWER COMPANY, Appellant, *v.* FRANK W. STEVENS et al., Constituting the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK FOR THE SECOND DISTRICT, Respondents.

Public service commissions — when discretion of commission cannot override the discretion of the officers of a corporation — duty and powers of commission to determine under section 69 of the Public Service Commissions Law whether a proposed bond issue is necessary for purposes of corporation and authorized by law — evidence — procedure.

1. One of the paramount purposes of the legislature in establishing the public service commissions was to protect and enforce the rights of the public, and the statute should be construed with that in view.

2. The discretion of a public service commission cannot override the discretion of the officers of a corporation in the management of its affairs, or the provisions of the statute which prescribes the cases in which securities are permitted to be issued. Its duty upon an application under section 69 of the Public Service Commissions Law (Cons. Laws, ch. 48) is to determine whether a proposed issue of bonds is necessary for the proper purposes of the company, is authorized by law and is to by used in a proper manner. If such are the

8   People ex rel. B. L., H. & P. Co. *v.* Stevens.

[203 N. Y.]                    Statement of case.                    [Oct.,

facts it cannot withhold its certificate; otherwise it cannot grant it. (*People ex rel. Delaware & Hudson Company* v. *Stevens,* 197 N. Y. 1, 10, approved and followed.)

3. It is beyond the power of the commission to permit the issue of improper securities upon condition that the company reduce its capital stock and such a condition is wholly unauthorized.

4. A reasonable consideration of the interests of a corporation and the ultimate good of its stock and bondholders, and a regard for the investing public and that fair dealing which should be observed in all business transactions, require that machines and tools paid for and charged to capital account but which necessarily become obsolete or wholly worn out within a period of years after the same are purchased or installed, should be renewed or replaced by setting aside from time to time an adequate amount in the nature of a sinking fund or that by some other system of financing the corporation put upon the purchaser from the corporation the expense not alone of the daily maintenance of the plant but a just proportion of the expense of renewing and replacing that part of the plant which although not daily consumed must necessarily be practically consumed within a given time.

5. The question as to what expenditures are a proper basis for permanent capitalization is always a proper and necessary object for consideration, not alone by the directors of a corporation, but by any commission that has authority to grant or withhold its con sent to the issue of new stock or bonds which are to become a part of the corporation's permanent capitalization, and it is the duty of the public service commission to determine whether the stock and bonds proposed by a corporation are to secure money to pay floating indebtedness incurred in the ordinary running expenses of the corporation. Such determination by the commission would not be substituting the judgment of the commission for the judgment of the directors of the company in the management of its affairs.

6. A statement of a petitioner's financial transactions in proceedings of this kind should be made in sufficient detail and with sufficient classification to show with reasonable certainty the exact question to be determined.

7. While the commission may not be bound by technical rules of evidence, still it is plainly intended that the whole proceeding for leave to issue bonds should assume a quasi-judicial aspect.

8. The commission being empowered to subpœna witnesses and take testimony, its inspectors or agents can be required to appear and verify any reports made by them, or if such reports could be received in the first instance without verification, the inspectors or

agents can be compelled to attend at the instance of either party and be examined as to the truth of the statements in their reports and their knowledge of the facts therein contained.

*People ex rel. Binghamton L., H. & P. Co.* v. *Stevens*, 143 App. Div. 789, reversed.

(Argued May 29, 1911; decided October 3, 1911.)

APPEAL from an order of the Appellate Division of the Supreme Court in the third judicial department, entered March 11, 1911, which confirmed an order of the public service commission for the second district requiring that the relator credit its fixed capital with the sum of $100,000 as a condition precedent to its execution and delivery of a mortgage and the issue of corporate bonds thereunder.

The facts, so far as material, are stated in the opinion.

*Adrian H. Joline* for appellant. The issue of securities petitioned for by the relator is necessary for the discharge of its obligations and should have been permitted under the provisions of section 69 of the Public Service Commissions Law (L. 1907, ch. 429). (*People ex rel. D. & H. Co.* v. *Stevens*, 197 N. Y. 1; *Gamble* v. *Q. C. W. Co.*, 123 N. Y. 91; *Matter of W. G. L. Co.*, 127 App. Div. 462.) The amendment of the Public Service Commissions Law, which went into effect after the application of this relator to the commission had been decided, was not retroactive and is not to be considered in the determination of this case. (*People ex rel. P. S. L. A. Society* v. *Miller*, 179 N. Y. 227; *G. & W. Ry. Co.* v. *N. Y. C. & H. R. R. R. Co.*, 163 N. Y. 228.) The fact that the property acquired and the improvements made by the relator may have consisted partly of replacements of its existing plant and property is wholly immaterial. (*Matter of W. G. L. Co.*, 127 App. Div. 462; *Willcox* v. *C. G. Co.*, 212 U. S. 19; *Lough* v. *Outerbridge*, 143 N. Y. 271; *M. & St. L. R. R. Co.* v.

10   People ex rel. B. L., H. & P. Co. *v.* Stevens.

[203 N. Y.]                Opinion, per Chase, J.                [Oct.,

*Minnesota,* 186 U. S. 257; *A. C. L. R. R. Co.* v. *Florida,* 203 U. S. 256; *C., etc., Ry. Co.* v. *Becker,* 35 Fed. Rep. 883; *Matter of Freight Rates,* 9 I. C. R. 382; Beale & Wyman on Railroad Rate Regulation, §§ 319, 411, 412; Watkins on Shippers & Carriers of Interstate Freight, § 52.) The provision contained in the order of the commission of January 31, 1910, making it a condition of the proposed issue of bonds that the relator should credit its fixed capital with the sum of $100,000, is erroneous. (*Matter of W. G. L. Co.,* 127 App. Div. 462.) The commission erred in basing its determination in any degree upon alleged information not adduced as evidence upon the hearing. (*People ex rel. Joline* v. *Willcox,* 134 App. Div. 563; 198 N. Y. 433; *Village of Saratoga Springs* v. *Saratoga,* 191 N. Y. 123; *People ex rel. Clark* v. *Roosevelt,* 168 N. Y. 488; *People ex rel. McAleer* v. *French,* 119 N. Y. 502; *People ex rel. Joline* v. *Willcox,* 194 N. Y. 383.)

*Ledyard P. Hale* and *Henry C. Hazzard* for respondents. Relator has no statutory or common-law right to capitalize expenditures made for replacements where the cost of the property replaced was originally charged to fixed capital and has not been credited thereto concurrently with its consumption in use. (*People ex rel. J. W. S. Co.* v. *Tax Comrs.,* 196 N. Y. 39, 57; 128 App. Div. 13; *People ex rel. Third Ave. R. R. Co.* v. *Tax Comrs.,* 136 App. Div. 155; *Knoxville* v. *Water Co.,* 212 U. S. 1; *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362; *Davison* v. *Gillies,* [L. R.] 16 Ch. D. 347, n.; *Kennebec Water District* v. *Waterville,* 97 Maine, 185; *Long Branch Commission* v. *Tintern Manor Water Co.,* 70 N. J. Eq. 71.)

Chase, J. Public service commissions were established in this state by chapter 429 of the Laws of 1907, to take effect July 1 of that year. The act was amended and revised

by chapter 480 of the Laws of 1910, which took effect June
14, 1910.   Section 69 of the act of 1907 as amended by the
act of 1910 (Cons. Laws, ch. 48), so far as now material, is
as follows: " A gas corporation or electrical corporation
organized or existing, or hereafter incorporated, under or
by virtue of the laws of the state of New York, may issue
stocks, bonds, notes or other evidence of indebtedness
payable at periods of more than twelve months after the
date thereof, when necessary for the acquisition of prop-
erty, the construction, completion, extension or improve-
ment of its plant or distributing system, or for the
improvement or maintenance of its service or for the dis-
charge or lawful refunding of its obligations *or for the
reimbursement of moneys actually expended from income
or from any other moneys in the treasury of the corpora-
tion not secured or obtained from the issue of stocks,
bonds, notes or other evidence of indebtedness of such
corporation, within five years next prior to the filing of
an application with the proper commission for the
required authorization, for any of the aforesaid pur-
poses except maintenance of service and except replace-
ments in cases where the applicant shall have kept
its accounts and vouchers of such expenditure in such
manner as to enable the commission to ascertain the
amount of moneys so expended and the purposes for
which such expenditure was made;* provided and not
otherwise that there shall have been secured from the
proper commission an order authorizing such issue, and
the amount thereof, and stating *the purposes to which
the issue or proceeds thereof are to be applied,* and that,
in the opinion of the commission, *the money, property or
labor to be procured or paid for by the issue of such
stock, bonds, notes or other evidence of indebtedness is
or has been reasonably required for the purposes speci-
fied in the order, and that except as otherwise permitted
in the order in the case of bonds, notes and other evidence
of indebtedness, such purposes are not in whole or in*

**12** People ex rel. B. L., H. & P. Co. *v.* Stevens.

[203.N. Y.]                Opinion, per Chase, J.                [Oct.,

*part reasonably chargeable to operating expenses or to income. Nothing herein contained shall prohibit the commission from giving its consent to the issue of bonds, notes or other evidence of indebtedness for the reimbursement of moneys heretofore actually expended from income for any of the aforesaid purposes, except maintenance of service and replacements, prior to five years next preceding the filing of an application therefor, if in the judgment of the commission such consent should be granted; provided application for such consent shall be made prior to January first, nineteen hundred and twelve.* For the purpose of enabling it to determine whether it should issue such an order, the commission shall make such inquiry or investigation, hold such hearings and examine such witnesses, books, papers, documents or contracts as it may deem of importance in enabling it to reach a determination. *Such corporation shall not without the consent of the commission apply said issue or any proceeds thereof to any purpose not specified in such order.* Such gas corporation or electrical corporation may issue notes, for proper corporate purposes and not in violation of any provision of this or of any other act, payable at periods of not more than twelve months without such consent; but no such notes shall, in whole or in part, directly or indirectly be refunded by any issue of stock or bonds or by any evidence of indebtedness running for more than twelve months without the consent of the proper commission. Provided, however, that the commission shall have no power to authorize the capitalization of any franchise to be a corporation or to authorize the capitalization of any franchise or the right to own, operate or enjoy any franchise whatsoever in excess of the amount (exclusive of any tax or annual charge) actually paid to the state or to any political subdivision thereof as the consideration for the grant of such franchise or right. * * * "

That part of the section quoted which is in italics was

added by the amendment of 1910, and in place of the paragraph beginning with the words "the money" and ending with the words "hundred and twelve" there was in the act of 1907 a clause as follows: "The use of the capital to be secured by the issue of such stock, bonds, notes or other evidence of indebtedness is reasonably required for the said purposes of the corporation."

The relator is a domestic corporation organized in 1902 for the purpose of generating and selling electricity for light, heat and power. On the last day of February, 1902, it acquired the property and franchises of the Binghamton General Electric Company, which company had on and prior to that day supplied electric light and power in the city of Binghamton. At the close of business on that day the balance sheet of the Binghamton General Electric Company showed so far as now material as follows:

Total fixed capital including franchises...... $585,954 92
Total floating capital...................... 21,204 66

$607,159 58

Liabilities.
Capital stock.................. $280,000 00
Funded debt.................. 266,500 00
Bills payable.................. 20,000 00
Accrued interest.............. 6,687 50
Surplus.. ................... 33,972 08
$607,159 58

It is asserted by the petition hereinafter mentioned that the relator issued for the assets of said company its common stock to the amount of $500,000 and its refunding mortgage bonds presumably upon the property purchased to the amount of $325,000. It does not appear just how the sale was consummated, who were the stock and bondholders of the Binghamton General Electric Company or of the relator, how or upon what terms the bonds and

stock of the old company were taken up or retired and the assets of the old company transferred to the new company. It does appear, however, that on the next day (March 1, 1902), the books of the relator were opened with a statement of assets as follows: "Plant, real estate, personal and other property, franchise rights, etc., not noted below and heretofore owned by Binghamton Gen. Elec. Co., $759,231.19." The other items of assets referred to as noted below are principally taken from the items comprising the floating capital as stated on the balance sheet of the Binghamton General Electric Company. The book value of the plant, etc., increased to the extent of $173,276.27 in one day. Such increase is unexplained in the record but it does appear that the increase did not arise from charging organization expenses to the capital account prior to the entry of March 1, 1902, because subsequently there was charged to capital account the organization expenses aggregating $79,795.83, the details of which it is unnecessary to enumerate at this time. From March 1, 1902, until the filing of the petition hereinafter mentioned the relator spent for what it terms new plant and property improvements and betterments or became liable therefor pursuant to contract obligations the sum of $441,792.90. In the meantime and prior to July 1, 1907, it had issued and sold $175,000 more of its first refunding mortgage bonds and $150,000 of six per cent cumulative preferred capital stock. During the same time it had sold property for $15,618.88 which it had credited to capital account.

On February 17, 1909, the relator filed with the public service commission in the second district its petition alleging facts from which the most of those above were taken, and asked for an order under section 69 of the Public Service Commissions Law authorizing,

1. A mortgage to be dated April 1, 1909, to secure $1,000,000 of five per cent bonds with the right to issue forthwith, a, $500,000 of said bonds to enable the peti-

tioner to acquire an equal amount of its bonds then outstanding; b, $180,000 additional of said proposed bonds.

2. $50,000 of its six per cent cumulative preferred stock.

It was stated in the petition that the petitioner proposed to use the proceeds of the $180,000 of bonds and of said proposed stock to pay and discharge its promissory notes outstanding, amounting to $158,000, and the balance in paying, to the extent thereof, its floating indebtedness.

It is alleged in a schedule attached to the petition that the petitioner was indebted to the extent of $244,315.76, not including the funded debt of $500,000, and such indebtedness is made up of notes payable not exceeding twelve months from date, amounting to $158,000, and open accounts amounting to $86,315.76.

A hearing was had before the commission, and on August 4, 1909, it made an order denying the application but continuing the proceeding to enable the petitioner to proceed therein upon the lines suggested in the written opinion filed by the commission, if it should so desire. A reference to the record shows that the commission was of the opinion that the indebtedness represented by the $158,000 of notes was incurred for construction purposes, but that it was further of the opinion that the construction was in whole or in part mere renewal or replacement of old and obsolete plant and it accompanied its order denying the application not only with a provision continuing the proceeding for the purposes stated but it stated in its opinion that " A mere denial of this part of the application does not fully meet the situation. The notes in question are lawful obligations and must be paid. The case should be continued for the purpose of ascertaining by full and detailed proof the sum at which the old plant is now carried in fixed capital. As above stated, the exact amount the commission has been unable to

ascertain. When such amount is ascertained then various courses are open."

Referring to the application of the relator and its indebtedness other than the $158,000 represented by said notes the commission further say: "Of the proceeds only $158,000 would be required to pay the notes in question. What does it propose to do with the remainder of the proceeds? It points out nothing which comes within any of the purposes enumerated in section 69 of the Public Service Commissions Law, for which it may be allowed to issue stock or bonds. It desires to acquire no property. It does not ask to extend or improve its plant or distributing system. It suggests nothing for the improvement or maintenance of its service. It names no obligation and no creditor to be paid.

"Its floating indebtedness as shown by balance sheet submitted is as follows:

| | | |
|---|---|---|
| Bills payable.............................. | $158,000 | 00 |
| Accounts payable.......................... | 19,109 | 96 |
| Dividends payable Jan. 15, 1909........... | 6,000 | 00 |
| Consumers' deposits....................... | 345 | 76 |
| Accrued interest on bonds................. | 6,250 | 00 |
| Accrued taxes............................. | 869 | 00 |
| Total current liabilities................ | $190,574 | 72 |

"Bills payable have been fully considered. Accounts payable are not proper subjects of capitalization, being in general mere operating expense and in this case are offset by accounts receivable to the amount of $25,127.87. Dividends, consumers' deposits, accrued interest on bonds and accrued taxes should be paid out of income."

After conferences with the representatives of the petitioner a further order was made January 31, 1910, which recited among other things: "The applicant is understood to have assented, so far as it is able to do so without a meeting of its stockholders, to a reduction of its capital

stock to the amount of $100,000 to the end that thereby its fixed capital may be credited with said sum of $100,000."

The order provided for the issue of bonds to the extent of $197,500 to be sold and disposed of at not less than 80% of their par value and the avails thereof used for the sole and only purpose of paying and discharging the indebtedness aggregating $158,000 represented by said notes and the order was accompanied with a condition as follows: "Provided that this authorization is upon condition to be assented to by said Binghamton Light, Heat and Power Company that contemporaneously with issuing said bonds to said amount of $197,500 or any part thereof, it shall credit its fixed capital with the sum of $100,000 which may be accomplished by a reduction of the common capital stock of said company to a like amount, and this authorization to issue bonds to said amount of $197,500 shall not become effective until said company shall have filed with this commission its written acceptance of said condition."

Thereafter a further application was made to the commission by the relator for a rehearing of said application so far as the commission had denied the original request of the petitioner. On August 25, 1910, the application for a rehearing was denied. The relator on September 19, 1910, filed its petition with the Supreme Court asking for a writ of certiorari to the end that the three orders made by the commission be reviewed and reversed or so modified that the prayer of the original petition be granted. The writ was allowed and the matter was heard in the Appellate Division, third department, where the orders of the commission were confirmed by a divided court. (*People ex rel. Binghamton L., H. & P. Co.* v. *Stevens,* 143 App. Div. 789.)

By the report of the relator to the public service commission as of December 31, 1908, it appears that the fixed capital account as carried on the books of the company

amounted to $1,302,725.72.  It appears to have been made up of three items as follows:

| | | |
|---|---:|---:|
| Organization expenses...... | $79,795 83 | |
| Franchise, land, old plant and property account......... | 781,136 99 | |
| Other fixed capital......... | 441,792 90 | |
| | | $1,302,725 72 |

As against this item the company showed that they had outstanding bonds to the extent of $500,000; preferred stock, $150,000; common stock, $500,000; making a total of stock and funded debt, $152,725.72, less than the amount of its fixed capital as shown by the report.

The item of $441,792.90 in fixed capital represents the expenditures on the plant after the purchase of the Binghamton General Electric Company.  It further appears from the record that substantially all of the physical property purchased of the Binghamton General Electric Company has passed out of existence by the complete rebuilding of the plant.  Nevertheless, it is all carried on the books of the company as capital without any part of the cost being charged off in any way because of the renewal or replacement of the generating station, equipment and tools constituting the relator's plant.

It is noticeable that the $100,000 which the commission directed should be taken from the capital account of the relator by a reduction of its capital stock as a condition of granting its consent to the issue of $195,000 of the bonds of the relator is not based upon findings of the commission relating to its expenditures.  There is nothing before us to show that the difference between such two amounts constitutes a legitimate increase of the capital account of the relator.  A careful examination of the record satisfies us that the order of January 31, 1910, was an arbitrary one not based upon any determination in detail of the facts relating to the application, but a compromise based upon an assumption that the relator

and its stockholders would assent thereto. No such assent has ever been given and the assumption of the commission was based upon a statement made by certain representatives of the relator, with whom the matter was orally discussed.

The several owners of the capital stock of the relator as *bona fide* holders thereof had vested interests therein which the officers of the relator and the relator itself were powerless to take from them without compensation or in pursuance of a voluntary surrender.

The relator is not bound by the assumption of the commission even if the order was made in good faith relying upon it. On any determination of the reason that induced the commission to make the order of January 31, 1910, we agree with Justice KELLOGG wherein he says in his dissenting opinion in the Appellate Division as follows: "It is beyond the power of the Commission to permit the issue of improper securities upon the condition that the company cancel stock of about half the amount. Read together, the two orders permit the company to issue unauthorized securities, but attempt to lessen the harm to the public which may result therefrom. The Commission has no power to thus barter away the public interests, or on its own terms to permit the issue of securities which the law prohibits. Its discretion cannot override the discretion of the officers of the company in the management of its affairs, or the provisions of the statute which prescribe the cases in which securities are permitted. Its duty in the premises is to determine whether the proposed issue is necessary for the proper purposes of the company, is authorized by law and is to be used in a proper manner. If such are the facts it cannot withhold its certificate; otherwise it cannot grant it." (p. 801.)

The condition imposed by the commission, unless perhaps to adjust the financial affairs of the corporation with the consent of the stockholders or stockholders and bondholders, was wholly unauthorized.

If when an order is granted a condition is imposed by consent it should be based upon facts justifying the order with the imposition of the condition. The record before us does not permit this court if it had the authority to determine what if any order should be made by the commission. That the views of the court may not be misunderstood on a rehearing we repeat what was said by this court in *People ex rel. Delaware & Hudson Company* v. *Stevens* (197 N. Y. 1, 10): "We do not think the legislation alluded to was designed to make the commissioners the financial managers of the corporation, or that it empowered them to substitute their judgment for that of the board of directors or stockholders of the corporation as to the wisdom of a transaction, but that it was designed to make the commissioners the guardians of the public by enabling them to prevent the issue of stock and bonds for other than the statutory purposes; these purposes we have already enumerated in quoting the statute, the last being for the discharge or lawful refunding of its obligations."

The language quoted was used in considering the action of the board of directors of the relator in that case in the purchase of the stock of another corporation and of certain real property.

There was not in that case before the commission or the court for consideration the question as to whether an outstanding indebtedness for which stocks and bonds were sought to be issued was incurred in purchasing property for or in making betterments and enlargements of the plant of the relator, or for renewals and replacements of the plant or any part of it as it had theretofore existed. The court in that case, in referring to the intent of the legislature, said that by its enactment the commissioners should have supervision over the issuing of long time bonds to the extent of determining whether they were issued under and in conformity with the provisions of the statute for the purposes mentioned therein, or whether

they were issued for the discharge of the actual and not the fictitious debts of the company, or whether they were issued for the refunding of its actual obligations and not for the inflation of its stocks or bonds; and continuing the court further say: "Beyond this it appears to us that the power of the commissioners does not extend, unless it may pertain to the power to determine whether an obligation should be classified as operating expenses and as to whether such expenses should be paid by obligations running beyond a year." (p. 13.) The question as to whether the commission has authority to classify the expenditures of a corporation and ascertain what part thereof should be charged to capital account and what part to operating expenses was thus expressly reserved for further consideration.

The amendment of the statute in 1910 gives to the commission authority to authorize the issue of stocks, bonds, notes or other evidences of indebtedness of a corporation payable at periods of more than twelve months after the date thereof for the discharge or lawful refunding of its obligations or for the reimbursement of moneys actually expended from income or from any other moneys in the treasury of the corporation not secured or obtained from the issue of stocks, bonds or other evidence of indebtedness of such corporation within five years next prior to the filing of the application, but it expressly excepts from such authority of the commission the right to authorize the issue of such stocks, bonds or other evidence of indebtedness for maintenance of service and for replacements. It also provides that the applicant for such permission must have kept accounts and vouchers in such manner as to enable the commission to ascertain the amount of money so expended and for the purposes for which the expenditure was made. The question as to what expenditures are a proper basis for permanent capitalization is an important one, always a proper and necessary subject for consideration, not alone by the

22   People ex rel. B. L., H. & P. Co. *v.* Stevens.

[203 N. Y.]            Opinion, per Chase, J.            [Oct.,

directors of a corporation, but by any commission that has authority to grant or withhold its consent to the issue of new stock or bonds which are to become a part of the corporation's permanent capitalization.

Wholly apart from the claim of the commission that this case must be determined upon the statute as it now exists, and assuming for the purpose of what we are here saying that the relator is right in claiming that this appeal must be determined upon the statute as it existed on the day when the original petition herein was filed, we are nevertheless of the opinion that it was the duty of the commission to determine whether the stock and bonds proposed by the relator were to secure money to pay floating indebtedness incurred in the ordinary running expenses of the corporation. Such determination by the commission would not be substituting the judgment of the commission for the judgment of the directors of the company in the management of its affairs at least if the directors of the company had wholly and intentionally ignored the self-evident proposition that except for special and extraordinary circumstances some part of the expenses of renewing machines and plant originally charged to capital account must be paid as a part of the operating expenses of a corporation from year to year. We refer to the necessity of a corporation providing for some part of the expenses of renewing machinery and plant from year to year as self evident, because it has been so considered and expressed by the courts in many cases. (*People ex rel. Jamaica Water Supply Company* v. *Tax Commissioners*, 196 N. Y. 39, 57, 58; *S. C.*, 128 App. Div. 13, 17, 18; *People ex rel. Third Avenue R. R. Co.* v. *Tax Commissioners*, 136 App. Div. 155, 159; affd., 198 N. Y. 608; *City of Knoxville* v. *Knoxville Water Company*, 212 U. S. 1.)

In the *Jamaica Water Supply Company* case this court said : " We suppose that judicial notice may be taken of the fact that in the conduct of many industrial

enterprises there is a constant deterioration of the plant which is not made good by ordinary repairs, which, of course, operates continually to lessen the value of the tangible property which it affects. The amount of this depreciation differs in different enterprises, but the annual rate is usually capable of estimate and proof by skilled witnesses. No corporation would be regarded as well conducted which did not make some provision for the necessity of ultimately replacing the property thus suffering deterioration." (p. 57.)

In that case in the Appellate Division it was said: "The net income of a corporation for dividend purposes cannot be determined until all taxes, depreciation, maintenance and up-keep expenditures have been deducted. Otherwise the dividend is not paid from the earnings but by a depreciation of the capital account. To earn a dividend and be honest with itself, its stockholders, its creditors and the public it has to serve, a corporation cannot distribute earnings at the expense of its capital." (p. 17.)

In the *Third Avenue Railroad* case it was said: "The annual ordinary expenditures for repairs, replacements and renewals upon such a property cannot be assumed to make it unnecessary to provide a fund which will replace its engines, electrical equipment and other physical property which at some time must be replaced." (p. 159.)

In the *City of Knoxville* v. *Knoxville Water Co.* case it was said: "It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that, at the end of any given term of years the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stockholders, and, in the case of a public service corporation at least, its plain duty to the public. If a different course were pursued the only method of providing for replacement of property which has ceased to be useful would be the investment of new capital and the issue of new bonds or

stocks. This course would lead to a constantly increasing variance between present value and bond and stock capitalization — a tendency which would inevitably lead to disaster either to the stockholders or to the public, or both. If, however, a company fails to perform this plain duty and to exact sufficient returns to keep the investment unimpaired, whether this is the result of unwarranted dividends upon over issues of securities, or of omission to exact proper prices for the output, the fault is its own." (p. 13.)

It is said by the relator that the Public Service Commissions Law as it existed in 1909 did not make any distinction between expenditures for operating purposes and expenditures for permanent improvements, but provided generally for the issue of stocks, bonds, notes or other evidence of indebtedness payable at periods of more than twelve months after the date thereof " when necessary for *the acquisition of property*, the construction, completion, extension or improvement of its plant or distributing system, or for the improvement *or maintenance* of its service *or for the discharge or lawful refunding of its obligations*."

Omitting from that part of the statute just quoted the words in italics it would then clearly refer to the permanent improvement of the plant or distributing system, and not to mere renewals or replacements. The words in italics, although of broader meaning than those not in italics, should be construed in connection with them, and in view of one of the paramount purposes of the legislature in establishing the commissions, which was to protect and enforce the rights of the public. The contention of the relator would enable any corporation to pay for labor, fuel and other supplies constituting the most ordinary of all operating expenses by obligations extending less than twelve months and then apply from time to time to the commission for authority to issue stock or bonds for the payment of such obligations

and insist upon the same as a matter of right, without limit.

It will not be denied that fuel and such other materials as are consumed from day to day and the labor incurred in daily maintenance should be paid for from the earnings of the corporation as a part of its running expenses prior to the payment of interest upon bonds or dividends upon capital stock. A reasonable consideration of the interests of a corporation and the ultimate good of its stock and bondholders, and a regard for the investing public and that fair dealing which should be observed in all business transactions, require that machines and tools paid for and charged to capital account but which necessarily become obsolete or wholly worn out within a period of years after the same are purchased or installed, should be renewed or replaced by setting aside from time to time an adequate amount in the nature of a sinking fund or that by some other system of financing the corporation put upon the purchaser from the corporation the expense not alone of the daily maintenance of the plant but a just proportion of the expense of renewing and replacing that part of the plant which although not daily consumed must necessarily be practically consumed within a given time. If that is not done and renewals and replacements are continually added to the capital account the capital account must necessarily become more and more out of proportion to the real value of the property of the corporation.

The amendment of the statute made in 1910 was, so far as it affects the determination of this appeal, a statement in clearer terms of the intention of the statute of 1907, and it did not in the respect now considered give to the commission new and theretofore non-existing power. There is a wide difference in the claim of the parties as to the amount of the relator's floating debt, and some of the statements of fact in this opinion relating thereto may not meet with the approval of both parties. Such

26   People ex rel. B. L., H. & P. Co. *v.* Stevens.

[203 N. Y.]            Opinion, per Chase, J.            [Oct.,

difference chiefly arises from the fact that the evidence
and schedules before the commission and the record before
us are quite unsatisfactory.   A statement of a petitioner's
financial transactions should be made in proceedings of
this kind in sufficient detail and with sufficient classifica-
tion to show with reasonable certainty the exact question
to be determined.

The commission, with the assent of the relator, sent
an accountant to examine its books and an engineer to
examine and appraise its plant, but the details of the
report of each need not be stated.

This court, in *Village of Saratoga Springs* v. *Saratoga
Gas, Electric Light & Power Company* (191 N. Y. 123,
148), referring to the power of the state commission of gas
and electricity under chapter 737 of the Laws of 1905 and
the *ex parte* reports of inspectors and agents, say: "It is
plain that no corporation could make its defense until it
was clearly notified of what was charged against it and
the proof to support such charge was given.   While the
commission might not be bound by technical rules of evi-
dence, still it was plainly intended that the whole pro-
ceeding should assume a quasi-judicial aspect.   This is
necessarily so, for the Appellate Division is empowered
to review the order of the commission, a review which
requires something in the shape of a record of the pro-
ceedings of the commission.   The commission being
empowered to subpœna witnesses and take testimony, its
inspectors or agents could be required to appear and verify
any reports made by them, or if we assume that such
reports could be received in the first instance without
verification, the inspectors or agents could be compelled
to attend at the instance of either party and be examined
as to the truth of the statements in their reports and their
knowledge of the facts therein contained." The language
used in that case is applicable to this case so far as the
reports of the engineer and accountant are concerned.   It
is not necessary to consider whether the relator is estopped

from asserting that the commission in this case should not have considered the reports of the accountant and engineer in view of the disposition about to be made of this appeal.

The order of the Appellate Division and the three orders made by the commission should be reversed, without costs, and in the discretion of the relator the proceeding should be held open for a further hearing herein or a new application and a new hearing may be had unprejudiced by the orders that have already been made.

CULLEN, Ch. J., GRAY, HAIGHT, WERNER, WILLARD BARTLETT and COLLIN, JJ., concur.

Order reversed, etc.