IN RE CENTRAL MAINE POWER COMPANY.

Kennebec.     Opinion January 21, 1931.

*E. H. Maxcy,*
*L. A. Burleigh, Jr.,*
*N. W. Wilson,* for petitioner.
*Clement F. Robinson,* Attorney General, for the State.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, FARRING-
TON, THAXTER, JJ.

PATTANGALL, C. J.   On exceptions to order of Public Utilities
Commission. The Central Maine Power Company, a subsidiary of
the New England Public Service Company, is the largest public
utility of its kind operating in Maine. On February 14, 1928, it
filed with the Public Utilities Commission a petition asking ap-
proval for the issuance of not exceeding 7,913 shares of common
capital stock of the Company "for the purpose of the discharge
and lawful refunding of its obligations, to-wit: Its obligations in-
curred in providing the necessary funds for the acquisition of prop-
erty used for the purpose of carrying out its corporate powers,
and for the construction, completion, extension and improvement
of its facilities, and the improvement and maintenance of its serv-
ice, to the amount of $791,386.61, which is the amount of un-
amortized discount on the several bond issues of Central Maine
Power Company."

The petitioner also alleged that:

"Central Maine Power Company has issued, from time to
time, its bonds in manner as shown in this petition . . . The
bonds so issued have been sold by the Company at a price less
than the par value of said bonds. All of said bonds were sold
for the purpose of acquiring funds for the acquisition of prop-
erty for the carrying out of the Company's corporate powers,
for the construction, completion and extension of its plants and
properties, and for the improvement and maintenance of its
service to the public. In each case of the acquisition of prop-
erty and the construction of plants and properties, the Com-

pany has issued securities in principal amount sufficient only to pay for the actual cost, or a proportionate part thereof, of such properties. The sale of such bonds at a discount has made necessary the raising of funds by other means to provide the difference between the cost of the property or a proportionate part thereof, and the proceeds realized from the sale of bonds. This difference in money required, usually denominated as bond discount, has been secured by the Company by borrowing the same from various banks or others in the form of loans, maturing not more than twelve months from the respective dates thereof. The Company has necessarily been compelled to renew such loans from time to time. The notes of the Company securing such loans, whether issued originally or in renewal, are the obligations of the Company which it proposes to discharge and refund by the proceeds of common stock, the authorization for which is requested in this petition."

Satisfactory evidence was offered that between March 28, 1910, and December 1, 1927, petitioner, by permission of the Commission, issued bonds of the face value of $19,066,500; that these bonds were sold at prices which yielded to the petitioner total proceeds of $17,747,475; that the discount suffered on these sales was, therefore, $1,319,025; that of this amount there had been amortized $527,638.39 under orders of the Commission; and that the balance unamortized at the date when this petition was filed was $791,386.61.

The petitioner had issued temporary notes for this amount. The suggested stock issue was for the purpose of taking up these notes.

The Commission denied the petition. Exceptions were taken to this denial.

Such authority as the Commission has concerning the issuance of securities is found in Sec. 41, Chap. 62, R. S. 1930.

"Any public utility now organized and existing or hereafter incorporated under and by virtue of the laws of the state of Maine and doing business in the state may issue stocks, bonds which may be secured by mortgages on its property, franchises, or otherwise, notes or other evidences of indebtedness,

payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property to be used for the purpose of carrying out its corporate powers, the construction, completion, extension or improvement of its facilities, or for the improvement or maintenance of its service, or for the discharge or lawful refunding of its obligations, or to reimburse its treasury for moneys used for the acquisition of property, the construction, completion, extension, or improvement of its facilities, or for the discharge or lawful refunding of its lawful obligations, and which actually were expended from income or from other moneys in the treasury of the corporation not secured by, or obtained from the issue of stocks, bonds, notes, or other evidences of indebtedness of such corporation, or for such other purposes as may be authorized by law; provided and not otherwise, that upon written application, setting forth such information as the commission may require, there shall have been secured from the commission an order authorizing such issue and the amount thereof and stating that in the opinion of the commission the sum of the capital to be secured by the issue of said stocks, bonds, notes, or other evidence of indebtedness is required in good faith for purposes enumerated in this section; but the provisions of this chapter shall not apply to any stocks or bonds or other evidences of indebtedness heretofore lawfully authorized and issued; provided, however, that the commission may at the request of any public utility approve the issue of any stocks or bonds heretofore authorized but not issued. For the purpose of enabling the commission to determine whether it shall issue such an order, the commission shall make such inquiries for investigation, hold such hearings and examine such witnesses, books, papers, documents, or contracts as it may deem of importance in enabling it to reach a determination."

The sole issue in the case is whether or not, under the provisions of this statute and on the admitted facts, the Commission was obliged, as a matter of law, to grant the petition.

Petitioner's position is that the proceeds of the notes which it desires to replace with stock were actually invested in property

necessary for the carrying out of the company's corporate purposes and, therefore, specifically within the scope of the provisions of the statute.

The notes were, as already stated, given to fill the gap between the face value of the bonds authorized and the price which the utility received from them; in other words, to cover the bond discount. Petitioner claims that it is its right to issue securities, regardless of face value, which will when sold, whether at a discount or otherwise, produce the amount of money in good faith required to make an authorized investment and that if, in pursuing that course, a disparity between the face of the securities issued and the amount of the investment exists at the inception of the transaction, the difference may be provided for by an amortization fund so that the final result will produce a sound foundation for all outstanding securities.

The Commission on the contrary takes the position that when, to provide for an investment of $19,066,500, it authorized an issue of $19,066,500 par value of bonds, it exhausted its authority; that the utility was not obliged to sell the bonds below par; that no necessity existed for its so doing; that it was done for the convenience of the utility and in order that it might be enabled to market its bonds at a low rate of interest; that bond discount is in reality deferred interest, must be financed out of earnings, and may not properly be capitalized. It asserts that there is no distinction between securities issued directly to cover bond discount and those issued to take up notes given to cover bond discount, and that neither comes within the scope of the purposes enumerated in the statute.

The questions thus raised are not only novel in this jurisdiction but have never, so far as our information goes, been passed upon by any court. They have been discussed somewhat by text writers and have been considered by several public service commissions, the provisions of our statute being generally similar to those enacted in several other states.

The decisions of the Commissions are neither uniform nor consistent. In our own state, *In re Central Maine Power Company,* 1919, U 329, the view here expressed by petitioner was sustained by

the Commission; but *In re Penobscot Power Company*, 1922, E 866, it reconsidered the matter and adopted the policy evidenced by its decision in the instant case.

The Commissions of Indiana, Montana, Georgia, and Wisconsin have refused to permit the capitalization of bond discount, as did that of Illinois until it reversed its position in a divided opinion *In re Southern Illinois Gas Co.*, 1916, C 704. The Maryland Commission, on the contrary, like that of Maine, was at first favorable to this petitioner's theory, but *In re Baltimore County Water and Electric Co.*, 1918, F 565, came to the opposite conclusion.

In Arizona, Nebraska and New Hampshire, utilities have been permitted to issue securities based on payments of bond discount. The California Commission *In re Nevada, California and Oregon Tel. & Tel. Co.*, 1927, B 662, decided that "any expense incurred in connection with the issue of bonds should be paid out of earnings."

In the absence of any authoritative precedent and because of the lack of uniformity in the decisions of the Commissions of other states, accounted for in part by slight differences in statutes but more largely because of differences in the views of the members of the Commissions as shown by frequent reversals of opinion in certain states as the personnel of the Commissions changed, we are obliged to reach our conclusion from a study of the provisions of our own statute and an analysis of the exact situation presented here.

The statute imposes upon the Commission certain duties and confers upon it certain authority with respect to the issue of securities and obligations other than those maturing within twelve months from the date of their issue, prescribing the conditions and defining the purposes for which such securities may be issued.

These purposes are: (1) for the acquisition of property to be used in carrying out its corporate purposes; (2) for the construction, completion, extension or improvement of its facilities; (3) for the improvement or maintenance of its service; (4) for reimbursing the treasury for actual expenditures for these purposes; (5) for discharging or refunding these liabilities.

The utility must provide for the payment of current business

expense out of earnings. Salaries, taxes, insurance, depreciation and interest are among the items which must be thus taken care of, and short time notes given for the purpose of procuring funds to meet any bills of this sort would not be obligations which could properly be refunded by the issue of permanent securities. *People ex rel Binghampton Light, Heat & Power Co.* v. *Stevens,* 203 N. Y., 7.

If stock is to be substituted for the notes in question, it must be because the proceeds of the notes were used for one or more of the first four purposes enumerated above. Petitioner claims that such is the case. In order to determine whether or not its position is correct on this point, it may be well to reëxamine and restate the exact situation and the exact facts concerning the issue of the notes.

An investment of $19,066,500 in capital assets was proved to have been made or was in contemplation by the utility. For the purpose of reimbursing its treasury for actual expenditures in the acquisition of this property or for the purpose of furnishing funds with which to acquire it or both, permission was given to issue bonds of the face value of $19,066,500.

Had these bonds been sold at par, the incident would have been closed. The utility undoubtedly could have sold them at par but in order to do so would have been obliged to pay a comparatively high rate of interest. It decided, in the exercise of good business judgment, to issue bonds bearing a lower rate of interest and sell them at a discount. The proceeds of the bonds amounted to $17,747,475. It then issued short term notes of $1,319,025, the amount of the discount, and proceeded to apply sufficient of its earnings each year to the payment of these notes so that, if the payments were continued, the notes would be fully paid at the maturity of the bonds.

Negotiating these notes did not add anything to the assets of the utility. The proceeds were used to pay the difference between the face of the bonds and the price at which they were marketed or what is usually denominated bond discount.

Our inquiry, therefore, is whether or not bond discount may properly be capitalized. There is obviously no difference between

issuing stock for the purpose of paying bond discount and issuing stock for the purpose of taking up notes, the proceeds of which were used to pay bond discount.

It is perfectly legitimate for a utility to sell its bonds at less than their face value. Indeed, experience has proved that a saving in interest is effected by so doing and that such bonds are more easily marketable. But if a thousand dollar bond which could be sold at par provided it bore interest at six per cent sells for nine hundred dollars when paying five per cent, it is apparent that the obligor pays for the use of the nine hundred dollars which it receives, not only fifty dollars annually during the life of the bond, but one hundred dollars additional at its maturity. Bond discount is, therefore, only another term for deferred interest.

Milton B. Ignatius, in "Financing Public Service Corporations," discusses the point as follows:

"Similarly, a corporation may discount its bonds. It can offer to accept an amount less than the par value, although it will be obliged to pay par upon maturity. The discount will represent an advance payment for the use of money, and since the bonds are currently interest-bearing, to the nominal interest rate must be added the rate prepaid by discount, and the result will be the effective interest rate.

"There may be a number of conditions warranting the issue of bonds at a discount. The prospective purchaser may consider himself entitled to a greater than the nominal rate of interest, either because of the terms and conditions of the bonds or because of the risk of the enterprise. He takes that extra interest by discounting the loan."

Whitten and Wilcox, in their work on "Valuation of Public Service Corporations," Vol. 2, page 1137, say:

"At first the cost of money was put forward chiefly in the form of bond discount, but analysis soon made it clear that bond discount is merely deferred interest, and therefore that the capitalization of bond discount as a part of construction cost would be a recognition of the incorrect practice of paying interest or operating expenses out of capital."

It could not be seriously argued that interest should be paid out of capital. It must be paid out of earnings and any attempt to capitalize a deferred interest charge or a note given to cover such a charge is an attempt to capitalize future earnings.

The plain intent of Sec. 41, Chap. 42, R. S. 1930, and a fair interpretation of its language, is that the permanent securities issued by a utility shall be balanced by its investment in capital assets. •

In the instant case, the investment of $19,066,500 stood as security for the issue of bonds of equal face value. If the theory of petitioner is correct, it could have insisted, at the time the bonds were authorized, upon a permit to issue in addition to the bonds 13,190 shares of stock of the par value of one hundred dollars, without disclosing to the Commission any offsetting investment other than bond discount, the stock not being represented by a single dollar of capital assets.

It was to prevent inflation of that kind that the Commission was given authority to supervise within the limits of the statute the issuance of securities by public utilities. The Commission was justified in denying petitioner's request. It could not have legally pursued any other course.

*Exceptions overruled.*