PEOPLE ex rel. BINGHAMTON LIGHT, HEAT & POWER CO. v. STEVENS et al.

(Supreme Court, Appellate Division, Third Department. March 8, 1911.)

1. ELECTRICITY (§ 4*)—PUBLIC SERVICE CORPORATIONS—FISCAL MANAGEMENT.
    The general maintenance of the plant of an electrical corporation should not be charged to capital, but to current expenses.
    [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*]

2. ELECTRICITY (§ 4*)—PUBLIC SERVICE COMMISSION—FISCAL MANAGEMENT.
    Where an electrical corporation was notified by the Public Service Commission of an examination by experts on its application for permission to issue bonds, as to whether certain expenditures were made for replacements, and was given the right to cross-examine the experts, or bring in evidence to rebut their testimony, the commission was authorized to make its finding upon their report that the expenditures were for replacements.
    [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*]

3. ELECTRICITY (§ 4*)—PUBLIC SERVICE COMMISSION—FISCAL MANAGEMENT.
    Public Service Commission Law (Consol. Laws 1910, c. 48) § 66, giving the Public Service Commission General supervision over gas and electric corporations, and section 69 requiring stocks and bonds to be issued by such corporations under the authority of the commission, and requiring the order granting such authority to state that the proceeds of the stocks and bonds are reasonably required for the purposes specified, was enacted primarily to prevent overcapitalization by such corporations, and protect the public from the issuance of watered securities by replacing property and carrying the original capitalization in addition to the cost of replacement, and prohibits securities from being issued and sold under a misleading statement in the fixed capital account.
    [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*]

4. ELECTRICITY (§ 4*)—PUBLIC SERVICE CORPORATION LAW—RETROACTIVE OPERATION.
    Laws 1910, c. 480 (Consol. Laws 1910, c. 48) § 69, effective June 14, 1910, permits a gas or electrical corporation to issue stocks, bonds, etc., in order to acquire property, to construct or improve its plant, to discharge or refund its obligations, or reimburse itself for money expended from income or other unsecured moneys in the treasury for any of such purposes, except the maintenance of service and replacements, provided an order is secured form the proper commission, authorizing such issue and stating the purposes to which it is to be applied, and that in the commission's opinion the property, etc., to be paid for by the issue is reasonably required for the purposes specified in the order, and that, except as otherwise permitted, such purposes are not in whole or in part wholly chageable to operating expenses or to income. *Held*, that the act applied to proceedings pending when it was enacted so that it would apply to an order made by the Public Service Commission on January 10, 1910, denying an application by an electrical company for permission to issue bonds, a rehearing on which was denied August 25, 1910.
    [Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. ELECTRICITY (§ 4*)—PUBLIC SERVICE COMMISSION—AUTHORITY.

Any discretion given to the Public Service Commission to refuse permission to issue bonds for reimbursing moneys chargeable to operating expenses or income is a legal discretion reviewable by the courts.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*]

6. ELECTRICITY (§ 4*)—PUBLIC SERVICE COMMISSION—FISCAL MANAGEMENT.

The provision made by a lighting and power corporation for depreciation and replacement is chargeable to income, so that bonds issued to refund money expended for replacement can only be issued by permission of the Public Service Commission.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 4.*]

Kellogg, J., dissenting.

Certiorari by the People, on the relation of the Binghamton Light, Heat & Power Company, against Frank W. Stevens and others, constituting the Public Service Commission of the State of New York for the Second District, and said Public Service Commission, to review its determination upon relator's application to make a mortgage, etc. Determination affirmed.

Argued before SMITH, P. J., and KELLOGG, SEWELL, and HOUGHTON, JJ.

Joline, Larkin & Rathbone, for appellant.

Ledyard P. Hale, for respondents.

SMITH, P. J. In 1902 this relator bought out the Binghamton General Electric Company. At that time there were outstanding $500,-000 of the common stock of the company and $325,000 of first-mortgage bonds. Since that time the company has expended in improvements, construction, and replacement about $546,000. This has been held by the commission to have been expended substantially all for replacement. As against that there has been issued $150,000 of cumulative 7 per cent. preferred stock and $175,000 of bonds. There is also outstanding $158,000 in the notes of the company and between $14,000 and $15,000 of account, both notes and account, representing part of this $546,000 which has been put into construction. In February, 1909, application was made to the Public Service Commission for authority to execute a general extension and refunding mortgage to secure the issue of $1,000,000 of bonds. Five hundred thousand dollars of these bonds were to be laid aside to redeem the $500,000 of bonds then outstanding. Of the balance authority was asked to issue $180,000 together with an additional $50,000 of preferred stock. It was estimated that the preferred stock would sell at about par, while the bonds would sell at about 80, and these two issues would produce about $195,000. This was to take up the notes of $158,000 and the construction or replacement account of between $14,000 and $15,000, and to pay about $25,000 in accounts payable, which were not claimed to have been made for the purposes of construction, improvement, or replacement, but were sought to be included that the accounts receivable of like amount might be used for working capital. The contention of the relator is that, because as against the $546,000 expended in construction, improvement, and replacement only $150,-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

000 of preferred stock and $175,000 of bonds has been issued, it is entitled to issue further fixed capital security to the extent of $221,-000, if need be, as representing the money actually put into capital of the plant. Upon August 4, 1909, the commission determined that the relator should not issue new bonds or new stock for the purpose of paying the $25,000 of accounts payable, and denied the petition of the relator to issue the $50,000 additional preferred stock, but authorized the issue of the general extension and refunding mortgage to secure $1,000,000 of bonds, $500,000 of said bonds to redeem the $500,000 bonds outstanding, and the issuance of $197,500 of bonds thereunder in addition, which upon a sale at 80 would produce $158,-000, the amount of the outstanding notes. This authority, however, was given only upon condition that the said company would credit to fixed capital the sum of $100,000. It was specifically pointed out to the relator that no requirement was made that the capital stock should be in fact reduced, but only that this sum should be credited as against the fixed capital charged, so that the books might more nearly show, as will hereafter appear, the proper relation between the fixed capital account and the actual assets of the corporation. The proceeding was not then dismissed, but was in terms continued to enable the relator to make further application and offer further proof upon the lines indicated in the opinion then handed down.

Before discussing the legal questions involved, it is well to point out the facts which led up to this decision of the commission. The balance sheet of the relator upon December 31, 1908, showed a fixed capital to the amount of $1,302,725.72. Included within this amount was $543,494.53, which had been put into construction and replacement, tangible and intangible, since the purchase from the Binghamton General Electric Company. The balance, $759,231.19, was the amount appearing upon the books of the company as of March 1, 1902, as the value of the property, real estate and personal and franchise rights of the Binghamton General Electric Company. It is perhaps interesting to note that upon February 28, 1902, the condensed balance sheet of the Binghamton General Electric Company showed total assets amounting to $607,159.58. This increase within a single day to $759,231.19, as it was placed upon the books of the relator, is nowhere explained. An expert in the employ of the Public Service Commission was put upon the books and examined the property of the relator and the property purchased by the relator from the Binghamton General Electric Company. Part of that property had been sold for about $15,000. All the remaining property that passed from the Binghamton General Electric Company was valued as $51,-000. So that of this $759,231.19 which is included in this $1,302,-725 of the claimed fixed capital of the relator over $600,000 in round numbers has absolutely disappeared. It is not contended that it has been fraudulently disposed of. The fact is that it has been laid aside and thrown away, and that in its place the new machinery and new construction has been substituted for which relator has charged fixed capital at $543,000.

Of course, there are certain betterments to property that are properly chargeable to capital. The general upkeep of a plant or of a

railroad, however, ought not to be charged to capital, but the company ought to be compelled to make such repair and replacement as a part of current expenses.. Of course, if this were not so, they could capitalize all running expenses periodically and call the gross income net income, and continually impoverish the company by paying improperly large dividends. Apparently that was what was done in this case. From the expenditures which make up the large amount of so-called assets there was not deducted the ordinary current expenses and repairs of the plant, and there is now an effort on the part of the company to capitalize these current expenses which the commission has very properly disapproved of.

In determining the price at which this Public Service Corporation can charge the public for its product, it is allowed only a fair return upon its actual value at the time. So that the statement of fixed capital in its balance sheet at $1,302,725 is an actual misrepresentation of at least $600,000. The relator was asking permission practically to float $1,000,000 worth of its bonds upon a valuation of about $600,-000, with a misrepresentation of an additional $600,000 at least as part of its fixed capital. These bonds will go upon the market with the advertised approval of the Public Service Commission. Every care should be taken, therefore, that those methods adopted by the law for the protection of the innocent purchaser should not become a trap to snare him. If the commission had power, therefore, to place any condition upon the authorization of this increase in bonds or stock, it would seem that the only criticism to be made upon their condition annexed was that it was not stringent enough.

It is here insisted that the commission was not authorized to find that the present value of the property transferred by the Binghamton General Electric Company was only $51,000, and that these moneys were expended substantially for replacements; that that finding is from the report of its special agent, which was not introduced at the hearing, and therefore was not proper evidence upon which any determination by them can be based. To support this contention the case of the People ex rel. Joline v. Willcox, 134 App. Div. 563, 119 N. Y. Supp. 641, is cited. That was a case in which it appears apparently for the first time upon the return to the writ of certiorari that certain private information had been considered by the commission in making the determination, and it was therefore held that the determination based thereupon could not stand. The learned justice in writing the opinion in that case based it in part upon the authority of the Village of Saratoga Springs v. Saratoga Gas & Electric Co., reported in 191 N. Y. 123–147. At page 148 (83 N. E. 693, at page 701 [18 L. R. A. (N. S.) 713]) the opinion in that case in part reads:

"It is plain that no corporation could make its defense until it was clearly notified of what was charged against it and the proof to support such charge was given. While the commission might not be bound by technical rules of evidence, still it was plainly intended that the whole proceeding should assume a quasi judicial aspect. This is necessarily so, for the Appellate Division is empowered to review the order of the commission, a review which requires something in the shape of a record of the proceedings of the commission. The commission being empowered to subpœna witnesses and take

testimony, its inspectors or agents could be required to appear and verify any reports made by them, or, if we assume that such reports could be received in the first instance without verification, the inspectors or agents could be compelled to attend at the instance of either party and be examined as to the truth of the statements in their reports and their knowledge of the facts therein contained."

The case at bar comes clearly within the rule therein stated. The relator was notified of the examination to be made by these experts. In the opinion of August 4, 1909, the conclusion of the expert was stated and the order was then made continuing the proceedings, giving the right to the relator to produce further testimony if he should so desire. After this opinion was written and upon August 24th, the commissioners wrote to relator among other things:

"The company is at liberty to ask for a further hearing, upon which it can present proof showing or tending to show that the foregoing assumption of fact is incorrect."

This fact assumed was that the expenditures had been for replacements.. A rehearing was asked for by relator by a notice which made no complaint that ex parte testimony had been received, which in no way questioned the facts which had been assumed by the commission in its determination, and no request was made to examine the experts or produce any testimony to show any greater value than $51,000 in the property that stood upon their books as fixed capital to the amount of over $700,000. With full notice given, therefore, of the finding of this fact upon the evidence of this expert, and full opportunity given to the relator either to cross-examine this expert or to bring other evidence to controvert his conclusion, the authority cited becomes inapplicable, and the commission must be deemed to have properly found the facts.

Under section 66 of the Public Service Commission's law (Consol. Laws 1910, c. 48), this commission is given general supervision of all gas corporations and electrical corporations. Under section 69 this stock or these bonds cannot be issued without authority from the commission, and the order granting that authority must state that the proceeds of the stock or bonds to be issued are "reasonably required for the purposes specified in the order." One of the primary purposes of this general law is to prevent overcapitalization and to protect the public from the floatation of securities that do not represent actual values. The mischief is just as great, whether this overcapitalization arises at the initiation of the corporation or whether it is the result of a process by which property has been replaced, and the original capitalization is still carried on the books in addition to the cost of replacement. In view, then, of the general purposes of the act, of the general supervision given by section 66 of the statute, and of the certificate required to be made under section 69, we are of opinion that the statute should be so construed as to authorize a condition that those securities shall not be sold over a misleading statement in the fixed capital account. It is true that the powers of the commission are stringently stated in the Delaware & Hudson Case, 197 N. Y. 12, 90 N. E. 60; but that statement must be read in connection with the questions then before the court for decision. In that case there

was no question of overcapitalization, no question of public protection. The question before the court in that case was simply as to the power of the commission to direct the policy of the corporation affecting only its own stockholders. The case of Matter of Watertown Gaslight Co., 127 App. Div. 462, 111 N. Y. Supp. 486, is cited as an authority by the relator. In that case application was made to make the fixed capitalization of the corporation $800,000. It was shown that the petitioning company had bought out the Watertown Gaslight Company for about $250,000, and had expended in improvements and extensions about $450,000. It was thus shown that there had been upwards of $700,000 put into the plant, while $100,000 was sought to be added as the value of what was called secondary franchises. The Public Service Commission found that the plant was worth $600,000, and authorized a fixed capitalization at that amount. This court upon appeal approved the acts of the commission as far as it refused capitalization for the $100,000 as the value of the secondary franchise. It also refused the application to capitalize to the full extent of the moneys invested to the amount of $700,000, and modified the conclusion of the commission only by adding $10,000 to the $600,000 allowed by the commission. In that case in the opinion of Justice Kellogg it is stated:

"The evidence does not disclose the cost of the old plant or its value, except we may infer its value from the purchase price. The present owners paid $87,500 over the par value of the stock, which does not seem an unreasonable price when we consider the earnings of the company hereinafter referred to."

The question of replacement was not there considered, and no question was raised as to any substantial overcapitalization or any needed protection by the public, so that the questions there discussed were materially different from those arising in the case at bar. Moreover, in that case the question arose as to the absolute refusal of the commission to grant permission to issue securities. Here the permission was granted, and was only conditioned upon the rectification of the company's books so as to more nearly show the relation between the actual value and the fixed capitalization as carried on those books. It is not impossible that criticism might be made of the act of the commission in determining that bonds only should be issued upon the request of the relator for authority to issue both bonds and stock. There might be some question as to the right of the commission to decide as to the policy of the company as between the issuance of bonds and stock if it were not for chapter 480 of the Laws of 1910 (Consol. Laws 1910, c. 48), which has amended the Public Service Commission's law, and which statute will now be considered.

This application was made in February, 1909. The order was first made denying the petition August 4, 1909. A rehearing was thereafter had resulting in the order of January 10, 1910, which is the order complained of. Upon August 25, 1910, relator's motion for a rehearing was denied. Upon June 14, 1910, chapter 480 of the Laws of that year took effect. Section 69 so far as is material reads as follows:

. "Sec. 69: Approval of issues of stock, bonds and other forms of indebtedness. A gas corporation or electrical corporation organized or existing, or hereafter incorporated, under or by virtue of the laws of the state of New York, may issue stocks, bonds, notes or other evidence of indebtedness payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property, the construction, completion, extension or improvement of its plant or distributing system, or for the improvement or maintenance of its service or for the discharge or lawful refunding of its obligations or for the reimbursement of moneys actually expended from income or from any other moneys in the treasury of the corporation not secured or obtained from the issue of stocks, bonds, notes or other evidence of indebtedness of such corporation, within five years next prior to the filing of an application with the proper commission for the required authorization, for any of the aforesaid purposes except maintenance of service and except replacements in cases where the applicant shall have kept its accounts and vouchers of such expenditure in such manner as to enable the commission to ascertain the amount of moneys so expended and the purposes for which such expenditure was made; provided and not otherwise that there shall have been secured from the proper commission an order authorizing such issue, and the amount thereof, and stating the purposes to which the issue or proceeds thereof are to be applied, and that, in the opinion of the commission, the money, property or labor to be procured or paid for by the issue of such stock, bonds, notes or other evidence of indebtedness is or has been reasonably required for the purposes specified in the order, and that except as otherwise permitted in the order in the case of bonds, notes and other evidence of indebtedness, such purposes are not in whole or in part reasonably chargeable to operating expenses or to income."

This statute is not discussed by the relator's counsel in his brief other than with the statement that it became a law after the relator's application had been filed. It was not the law at the time the order was made which is sought here to be reviewed. It was the law when the notice of a rehearing was denied. If we should reverse the determination of the commission, we could only send it back to the commission to make the certificate which the law requires, and they could only make such certificate as is now authorized by law. This proceeding is not akin to an action at law where the rights of the parties are determinable as of the date when the application is filed. The act of 1910 does not save proceedings pending before the commission prior thereto from the effect of its provisions, and it seems to me clear that our determination must be made upon the law as it now stands. I confess that I am unable to satisfactorily glean what was the full intent of the Legislature when that law was passed. It seems, in the first place, to authorize the issuance of stocks and bonds payable at a period of more than 12 months only in case where the moneys for which they are sought to be issued have not been used for "maintenance of service" or "replacements." Thereafter authority seems to be given to issue bonds, notes, and other evidences of indebtedness (not stock) only with the express permission of the Public Service Commission in case the moneys for which they are issued should properly be charged to "operating expenses or to income." The omission of the term "stock" from this sentence would seem to authorize only the issuing of bonds, notes, or other evidences of indebtedness for such purpose. If any force be given to the word "permitted" as therein used, it would seem to give a discretionary power to the commission in those cases where the moneys to be reimbursed were moneys which should

properly be chargeable to operating expenses or to income. If the commission has a discretionary power to refuse the issuance of bonds in this class of cases, it would seem to follow as a corollary that they have the power to condition their issuance by any reasonable qualification. Of course, the discretion therein given is a legal discretion and reviewable by the courts, but I have before indicated that in our opinion the condition was wisely imposed if it were within the power of the commission. This company has been paying dividends every year without laying aside anything for depreciation and replacement. That provision for depreciation and replacement is properly chargeable to income would seem to follow either as a matter of first impression or as a matter of authority. The case of the People ex rel. Jamaica Water Supply Co. v. Tax Commissioners, 128 App. Div. 13, 112 N. Y. Supp. 392, is an authority for that proposition in this court, and in that case the views of this court were sustained in the Court of Appeals, as reported in 196 N. Y. 39,.89 N. E. 581. See Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371. Other cases are cited by the commissioners in their opinion and by their counsel upon this brief which fully sustain this proposition. So that, if these moneys expended for replacement can in any way be refunded by the issuance of bonds, that can only be done under the permission of the Public Service Commission.

Our conclusion, therefore, follows that the relator has naught of which it can complain in the determination made, which must be confirmed with $50 costs and disbursements.

Determination confirmed, with $50 costs and disbursements. All concur, except KELLOGG, J., dissenting in opinion.

JOHN M. KELLOGG, J. (dissenting). The amendment to section 69 of the Public Service Commission law (chapter 480 of the Laws of 1910) was in force when the order denying the application for a rehearing was made. The terms of that statute prohibit the issue of bonds or stock to pay the notes in question, if they represent replacements or expenditures which are properly chargeable to operating expenses or to income. A corporation is an artificial body, the life, acts, and powers of which are regulated by statute. By the old statute, now section 55 of the stock corporation law (Consol. Laws 1909, c. 59), it can issue no stock or bonds except for money, labor done, or property actually received for its use and lawful purposes. Experience and business requirements have adduced from this provision, and the nature of corporations and their business, the rule that where machinery, appliances, and other property which become obsolete by time and use are represented in the capital account of a corporation their upkeep and replacement are properly chargeable to the expense or income account, and not to capital account. Otherwise the capital of a corporation would from year to year grow more and more out of proportion to the real value of its property. The courts recognize this rule. People ex rel. Jamaica W. S. Co. v. Tax Com'rs, 196 N. Y. 39, 89 N. E. 581; s. c. 197 N. Y. 33, 90 N. E. 112; Id., 128 App. Div. 13, 112 N. Y. Supp. 392; Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371.

The requirement that replacements of property already capitalized cannot again be charged to capital account, but are chargeable to operating expenses or to income, does not originate in this amendment to the statute, but the amendment to that extent is substantially a declaration of the existing law. An issue of 40-year bonds to meet the expenses of rebuilding a permanent plant may be considered an increase of capital liabilities. The section in question requires the commission to make such inquiry and investigation, hold such hearings, and examine such witnesses, books, papers, documents, or contracts as it may deem of importance to enable it to reach a determination whether or not its certificate should issue. The statute does not contemplate that the commission shall merely hear the proof offered, but that it shall make all proper investigation to enable it to decide the question which it is required to decide. The first order purports to deny the application, but holds the matter to enable the company to present further proof if it desires. The opinion referred to in the order indicates that from the evidence before the commission it considered that it could not definitely determine whether or not the notes were given for replacements, what the actual value of the property is, or just what the facts are. In substance, it assumes facts without sufficient proof, and thereupon denies the application, with permission to the relator to prove that it is wrong. The second order, without further evidence and without a rehearing, or an application for a rehearing, permits the company to issue $197,000 of new bonds upon condition that it cancel $100,000 of its capital stock, or credits fixed capital with that amount. The certificate of the commission is not required for the issue of bonds, notes, or like obligations which by their terms are payable within a year. It is only necessary in the case of stocks and of bonds, notes, and other evidence of indebtedness running longer than a year, being such securities as are usually bought and sold in the market, and the inference is irresistible that the object of the statute is to protect the public in the purchase of such securities. People ex rel. Jamaica W. S. Co. v. Tax Com'rs, 196 N. Y. 39, 89 N. E. 581; s. c. 197 N. Y. 33, 90 N. E. 112; Id., 128 App. Div. 13, 112 N. Y. Supp. 392. In every other respect a short-term note is subject to every reasonable objection which can be raised to one running more than a year, and the short-term obligation is more hazardous to the company and its stockholders.

The first order assumes that the notes represent replacements. The second order, apparently as a concession, without a different finding and without a rehearing, grants in part the certificate upon condition. It is beyond the power of the commission to permit the issue of improper securities upon the condition that the company cancel stock of about half the amount. Read together, the two orders permit the company to issue unauthorized securities, but attempt to lessen the harm to the public which may result therefrom. The commission has no power to thus barter away the public interests, or on its own terms to permit the issue of securities which the law prohibits. Its discretion cannot override the discretion of the officers of the company in the management of its affairs, or the provisions of the statute which prescribe the cases in which securities are permitted. Its

duty in the premises is to determine whether the proposed issue is necessary for the proper purposes of the company, is authorized by law, and is to be used in a proper manner. If such are the facts, it cannot withhold its certificate; otherwise, it cannot grant it. If the corporation has been properly managed, and its securities properly issued, the issue of new stock or bonds, if necessary for a corporate purpose for which securities may issue, cannot be denied solely upon the ground that the capital liabilities of the company thus increased will exceed the value of its physical property. Such circumstance may call for more careful examination of the entire situation, but alone will not justify the denial of bonds and stocks for an expenditure which a proper service to the public requires the company to make and for which the statute permits such securities. The commission does not create the law. Its sole duty is to see that the law in respect to such issues is observed.

It is not probable that the plant of the relator entirely broke down immediately after the purchase and required replacement on account of obsolescence. It is evident that the growth of the city of Binghamton and the requirements of the service made necessary a larger and more extended plant with greater facilities. Growing business requirements may make it necessary for a railroad company to replace its 60-pound rail with a 90-pound rail. If the 60-pound rail is represented in the capitalization, the difference between the cost of it and of the 90-pound rail is not so represented, and may be capitalized. It is an improvement or extension rather than a technical replacement. It is not reasonably chargeable to expense of operation or to income. If the growth of the city and demands of the service require engines, dynamos, or machinery of much greater capacity and consequently of much greater cost than those represented in the capitalization, the difference between the capitalized cost of the smaller engines, dynamos, or machines and that of the larger or more powerful ones which take their place may properly be represented in the capitalization. The mere fact, therefore, that the old plant was practically dismantled and a new and larger one constructed does not show that the expenditure or the greater part of it was necessarily a replacement. It may in great part have been an extension or improvement which from its nature was not reasonably chargeable to operating expenses or to income. The record gives us no real assistance in determining how much of the expenditures were for replacements and how much represented real extensions, improvements, and new property.

The record does not disclose whether or not the stock or bonds sought are necessary for a proper corporate purpose. The companies may have from the former issue of stock or bonds means with which it may meet all, or a part at least, of these notes. It does not appear that the company has received the par value of the stock heretofore issued to the firms or members thereof who are now virtually in control of the corporation, and who, in substance, make this application, and it is not clear whether or not other sums are payable by them to the company. It is apparent that, if the present owners of the company are indebted to it for moneys past due sufficient to pay the notes in question, there is no necessity for an issue of new stock or

bonds. The evidence indicates that the relator by its present principal owners delivered $350,000 of its common stock for the entire $280,000 capital stock of the Binghamton General Electric Company upon the property of which was a bonded indebtedness of $266,500, and also delivered $30,000 of its common stock for the stock of the Broome County Electric Light Company, which company had no tangible assets. It immediately proceeded practically to scrap the old plant and build a new and more expensive one. In the construction of the new plant but a small part of the old plant or property was of value, and but very little was realized from the part not used. The record necessarily suggests that the relator paid too much for the stock of the old companies, and that the same was not worth at the time of purchase $410,000 in addition to the bonded indebtedness. But immediately following the purchase the relator issued $120,000 of its common stock to the interests apparently controlling it for alleged services apparently in the making of this poor bargain. One of such interests is a banking firm, the other an engineering firm, or the members of those firms. We find the banking firm taking from the company preferred stock at $22,500 less than its par value, and several years afterwards, when advised by counsel that such act was illegal, a bookkeeping entry was made to equalize it by charging the company, in behalf of the firm, that amount for commissions on loans procured during several preceding years with the firm's assistance, indorsements, or guaranty. Twenty-five thousand dollars was paid for engineering, the particulars of which are not clear, and $42,000 for discount on bonds, the facts as to which do not fully appear. Neither does it appear who were the owners of the stock of the old companies for which the relator apparently paid an excessive price, or whether the same parties were practically both the sellers and buyers. Without further evidence, it does not appear what, if anything, is due the company from its present owners. It may be that upon a proper adjustment it will be found that the company does not need the new bonds to enable it to liquidate its outstanding notes. We are not determining that any of the stockholders are in fact indebted to the company on account of any of these matters; neither could the commission so determine because the evidence is an insufficient basis for a determination either way.

I think the commission did not make the inquiry or the determination contemplated by the statute, and that it was the right of the relator to have its application determined for or against it upon evidence which it has a reasonable opportunity to meet or explain. The property interests and the very life of the relator may depend upon the decision of the commission. The inquiry, so far as may be, should be surrounded with the usual safeguards required in the case of the trial of other questions of fact. The record does not disclose just what information the commission received from its expert, or whether it properly interpreted his conclusions. The relator had the right to hear his evidence and examine him. This case emphasizes the necessity of having the expert sworn as a witness as to facts upon which the commission may base its decisions. Otherwise a court of

review from the record before it cannot satisfactorily perform its duties.

It follows from these considerations that the three orders should be annulled and the matter remitted to the commission for further action, without costs.