PEOPLE ex rel. NEW YORK EDISON CO. v. WILLCOX et al.

(Supreme Court, Appellate Division, First Department. July 11, 1912.)

1. CERTIORARI (§ 33*)—PUBLIC SERVICE COMMISSION—ORDERS—"PARTY AGGRIEVED."

A rival public service corporation is not interested in the securities which the Public Service Commission may authorize a competing company to issue, and therefore with reference to that question cannot be a "party aggrieved" by the commission's order, so as to entitle it to a review thereof on certiorari.

[Ed. Note.—For other cases, see Certiorari, Cent. Dig. § 44; Dec. Dig. § 33.*

For other definitions, see Words and Phrases, vol. 1, pp. 273–278; vol. 8, pp. 7569–7570.]

2. ELECTRICITY (§ 4*)—RIGHT TO OPERATE—CONSENT OF PUBLIC SERVICE COMMISSION.

Laws 1907, c. 429, § 68, provided that no electric corporation should begin construction, or exercise any franchise previously granted, but not actually exercised, without having first obtained the approval of the proper Public Service Commission. By Act June 14, 1910 (Laws 1910, c. 480 [Consol Laws 1910, c. 48]), section 68 was amended, so as to provide that no electrical corporation should begin construction of its plant without first having obtained approval of the proper commission, nor should such a corporation exercise any franchise theretofore granted and not actually exercised, or the exercise of which had been suspended for more than a year without having obtained the approval of a commission, and that the commission should have power to grant such permission when, after due hearing, it determined that such construction or exercise of franchise was necessary or convenient for the public service. *Held*, that the amendment was not retroactive as to an electric company which had continuously exercised its franchise and furnished electricity to the public prior to its enactment, and hence where proceedings were instituted by such company for the commission's approval of an issue of stocks and bonds for the enlargement of its system in February, 1908, and the commission's denial of consent was reversed and the case remanded to the commission for consideration and action within the limits of its authority, such remand did not render the further proceedings a new proceeding, subject to the amendment, so as to require the corporation to show that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

it had obtained the permission and approval of the proper commission to the exercise of its franchises, after a finding that its service was necessary or convenient for the public service.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 1; Dec. Dig. § 4.*]

3. ELECTRICITY (§ 8*)—PUBLIC SERVICE CORPORATION—USE OF FRANCHISE—STOCKS AND BONDS—ISSUANCE—CONSENT OF PUBLIC SERVICE COMMISSION.

In a proceeding by an electric corporation under Laws 1907, c. 429, § 69, before a Public Service Commission for approval of an issue of stocks and bonds to finance improvements under such chapter, evidence *held* to justify a finding that the corporation prior to the amendment of such act by Act June 14, 1910 (Laws 1910, c. 480 [Consol. Laws 1910, c. 48]), had continuously operated its secondary franchise to use the streets of New York for the distribution of its product, and was not therefore required to obtain a certificate of necessity or convenience for the public service sought to be furnished, as required by the amendment in cases of corporations, the operation of whose franchises had been suspended for more than a year.

[Ed. Note.—For other cases, see Electricity, Dec. Dig. § 8.*]

4. CERTIORARI (§ 68*)—PUBLIC SERVICE COMMISSION—FINDINGS.

Findings of fact by the Public Service Commission can be set aside on certiorari only where there is such a preponderance of proof against the facts found that the verdict of the jury affirming the existence thereof would be set aside as against the weight of the evidence, as provided by Code Civ. Proc. § 2140.

[Ed. Note.—For other cases, see Certiorari, Cent. Dig. §§ 180–182; Dec. Dig. § 68.*]

5. ELECTRICITY (§ 4*)—ELECTRIC CORPORATION—USE OF FRANCHISE.

Where a corporation authorized to manufacture and sell electricity to consumers also had a secondary franchise to use the streets of a city for the distribution thereof, the carrying of electricity over the streets for general sale to consumers by means of leased poles and wires constituted an operation of such secondary franchise to the same extent as if the equipment was owned by the corporation.

[Ed. Note.—For other cases, see Electricity, Cent. Dig. § 1; Dec. Dig. § 4.*]

Ingraham, P. J., and Miller, J., dissenting.

Certiorari by the People, on relation of the New York Edison Company, against William R. Willcox and others, constituting the Public Service Commission of the State of New York for the First District, and another, to review an order of the Public Service Commission issued July 28, 1911, authorizing the Long Acre Electric Light & Power Company to issue certain securities. Writ dismissed, and proceedings confirmed.

See, also, 149 App. Div. 671, 134 N. Y. Supp. 241.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, MILLER, and DOWLING, JJ.

Morgan J. O'Brien, of New York City, for relator.
Charles F. Brown, of New York City, for respondent Long Acre Co.

DOWLING, J. The respondent Long Acre Electric Light & Power Company acquired by purchase, on March 21, 1906, a franchise

granted by the municipal authorities on May 31, 1887, to the American Electric Manufacturing Company:

"To locate and erect poles and hang wires and fixtures thereon, and to place, construct and use wires, conduits and conductors for electrical purposes in the city of New York, in, over and under the streets, avenues, wharves, piers and parks therein, or adjacent thereto."

Space in the subway ducts for the respondent's electrical conductors having been refused, mandamus proceedings were commenced in August, 1906, as authorized by the Laws of 1887, c. 716, § 3, to compel the Consolidated Telegraph & Electrical Subway Company to furnish respondent "just and equal facilities," pursuant to law, for its electrical cables.

The right to the mandamus depended upon the respondent establishing that it was "lawfully competent to manufacture, use, or supply electricity, or to operate electrical conductors in any street, avenue, or highway in the city of New York." In that proceeding the respondent established the validity of its franchise, and its right to manufacture, use, and supply electricity for light, heat, and power. Matter of Long Acre Electric Light & Power Co., 51 Misc. Rep. 407, 101 N. Y. Supp. 460; Id., 117 App. Div. 80, 102 N. Y. Supp. 242; Id., 188 N. Y. 361, 80 N. E. 1101. Throughout that litigation the Consolidated Telegraph & Electrical Subway Company appeared by the same attorneys representing the relator in this proceeding. After space had been assigned the respondent in the subway ducts, the municipal authorities, through the Department of Water Supply, Gas & Electricity, issued permits and gave its consent and authority to respondent to open the streets and draw its cables through the subway ducts; and in January, 1908, respondent erected a power plant, and commenced supplying its customers with electricity. From its annual reports, filed with the Public Service Commission, it appears that in 1908 it generated 134,926 kilowatts, and sold 53,439; in 1909 it generated 168,880 kilowatts, and sold 54,224; and in 1910, it generated 234,502 kilowatts, and sold 92,094, so that in 1910 its business had almost equaled in volume that of the two preceding years.

In February, 1908, an application was filed by the respondent with the Public Service Commission, under section 69 of chapter 429 of the Laws of 1907, for its approval to an issue of stocks and bonds for the enlargement of respondent's plant and distributing system. That application was denied June 26, 1908, and on review by this court, in April, 1910, it was held that the various reasons assigned by the commission for withholding its approval to the application were inadequate, and as the commission had not undertaken to decide what amount of securities should be permitted to be issued, or to what purpose their proceeds should be applied, the matter, to that extent, was referred back to the commission for consideration and action, within the limits of its authority. People ex rel. Long Acre Electric Light & Power Co. v. Public Service Commission of First Dist., 137 App. Div. 810, 122 N. Y. Supp. 641. An appeal to the Court of Appeals was dismissed September 29, 1910. 199 N. Y. 254, 92 N. E. 629.

The commission, instead of simply passing upon the two questions remitted to it, i. e., the amount of securities to be issued, and the purposes to which the proceeds should be applied, permitted the relator, which had been represented by counsel from the first public hearing, to introduce over the objection of the respondent additional evidence on the question whether the secondary franchise of the respondent had been operated prior to 1908. On this question considerable additional evidence was taken, and the commission found as a fact that the secondary franchise had been operated in 1889 and 1890 (one of the commissioners dissenting). An order was finally made authorizing an issue of $2,000,000 of bonds, but only after $1,000,000 of new stock shall have been subscribed and paid for in cash, and an additional issue of $2,000,000 of bonds was authorized after an additional $1,000,000 of stock shall have been subscribed and paid for; the bonds only to be disposed of at public sale, after being publicly advertised for four successive weeks, and at not less than 90 per cent. of their par value. And it was further provided by the order of the commission that the proceeds derived from the stocks and bonds were to be expended only after a proper itemized bill for each expenditure shall have been submitted to the commission and approved by it.

The New York Edison Company, which carries on a rival electric light business, seeks by writ of certiorari to review the action of the Public Service Commission.

When this matter was remitted to the commission, with instructions to pass upon the amount of securities to be issued, and the purposes to which the proceeds should be applied, within the limit of its authority, its duties were circumscribed, and no evidence should have been taken upon any other subject than the two specified. The question of the operation of the secondary franchise, prior to 1908, was considered and determined by this court, and we found that:

"It appears from the evidence and the report of the commissioner, who reported upon the application, that the American Electric Illuminating Company, the owner of the franchise, through mesne assignments, actually exercised it and supplied electricity to customers in 1889 and 1890, when it was practically driven out of business by the abolition of overhead wires in the city of New York." 137 App. Div. at page 816, 122 N. Y. Supp. at page 646.

. Orderly judicial procedure requires a subordinate body to follow the instructions of this court when a matter is remitted to it, with instructions. A "party aggrieved" may appeal to the Court of Appeals from the final order made pursuant to the directions of this court; but the commission had nothing to determine but the amount of securities it would authorize, and the application of the proceeds.

The Court of Appeals, in dismissing the appeal from our order, drew the distinction between this proceeding, and one in which an assessment is annulled, holding that "in the latter case the proceeding leading up to the second assessment is to all intents and purposes a new and independent proceeding"; but this proceeding "cannot be said to be finally terminated until the Public Service Commission has again acted pursuant to the order of the Appellate Divi-

sion." 199 N. Y. 255, 92 N. E. 629. We may therefore, upon this review, only consider the additional evidence so far as it relates to the two subjects remitted to the commission, and in respect of them no complaint is made by any one. Indeed, none could be made by the relator, because it is not a "party aggrieved."

[1] It is of no concern to a rival public service corporation what securities the commission may authorize a competing company to issue. In any event, the commission was very careful to conserve and protect the interests of the public. The amount of securities approved was modest in amount, considering the nature of the enterprise and operations; no bond could be sold at less than 90 per cent. of its par value, and then only after a large amount of cash for stock had been placed in the treasury of the company, to insure good faith; and none of the proceeds of the sale could be disposed of without the approval of the commission.

The relator, after arguing that the commission was authorized to take additional proof on the question of operation, contends that the proceedings are governed, not by the law existing at the time the petition was filed by the Long Acre Company, in February, 1908, but by the statute in force when the order under review was made. It is conceded by counsel that, if this proceeding is governed by the law in force when the petition was filed, the relator is not a "party aggrieved."

[2] When in February, 1908, the respondent filed its petition, under section 69 of the Laws of 1907, c. 429, it was provided by section 68 as follows:

"Sec. 68. Approval of Incorporation and Franchises; Certificate. No gas corporation or electrical corporation incorporated under the laws of this or any other state shall begin construction, or exercise any right or privilege under any franchise, hereafter granted, or under any franchise heretofore granted, but not heretofore actually exercised, without first having obtained the permission and approval of the proper commission. Before such certificate shall be issued a certified copy of the charter of such corporation shall be filed in the office of the commission, together with a verified statement of the president and secretary of the corporation, showing that it has received the required consent of the proper municipal authorities. No municipality shall build, maintain and operate for other than municipal purposes any works or systems for the manufacture and supplying of gas or electricity for lighting purposes without a certificate of authority granted by the commission. If the certificate of authority is refused, no further proceedings shall be taken before the commission but a new application may be made therefor after one year from the date of such refusal."

In 1910 (Laws 1910, c. 480 [Consol. Laws 1910, c. 48]), section 68 was amended so as to read as follows (the important new matter being here italicized):

"Sec. 68. Approval of Incorporation and Franchises; Certificate. No gas corporation or electrical corporation *shall begin construction of a gas plant or electrical plant without first having obtained the permission and approval of the commission of each district within which any part of the work of construction is to be performed.* No such corporation shall exercise any right or privilege under any franchise hereafter granted, or under any franchise heretofore granted, but not heretofore actually exercised, *or the exercise of which shall have been suspended for more than one year, without first having obtained the* permission and approval of the proper commission. Before such

certificate shall be issued a certified copy of the charter of such corporation shall be filed in the office of the commission, together with a verified statement of the president and secretary of the corporation, showing that it has received the required consent of the proper municipal authorities. *The commission within whose district such construction is to be made, or within whose district such right, privilege or franchise is to be exercised, shall have the power to grant the permission and approval herein specified whenever it shall after due hearing determine that such construction or such exercise of the right, privilege or franchise is necessary or convenient for the public service.* No municipality shall build, maintain and operate for other than municipal purposes any works or systems for the manufacture and supplying of gas or electricity for lighting purposes without a certificate of authority granted by the commission. If the certificate of authority is refused, no further proceedings shall be taken by such municipality before the commission, but a new application may be made therefor after one year from the date of such refusal."

This act took effect June 14, 1910. The contention of the relator is that the amendment is effective upon the pending application of the Long Acre Company, and that thereunder, before said corporation can exercise any right or privilege, it must obtain the permission and approval of the proper commission, and then after a determination that such exercise is necessary or convenient for the public service.

When these proceedings were commenced, there was no provision calling for a certificate of public necessity or convenience before the construction of a plant, or the exercise of any right or privilege under an electric light franchise, and the petition filed by the respondent contains no allegation on the subject of public necessity or convenience. No such allegation could well be made in the petition, because the statute providing therefor was only passed two years thereafter. If the contention of the relator is well taken, the petition and the entire proceedings are defective because provision is not made for something which had not become important or essential until after the proceedings were commenced. The relator's argument proceeds upon the theory that when the matter was remitted to the commission, and additional testimony taken on the *relator's* motion, it was practically a new proceeding, and therefore governed by the statutes of 1910. It was not a new proceeding. It was but a continuation of the pending proceeding "for further action by the commission" under instructions, and was only "finally terminated" when the Public Service Commission "again acted pursuant to the order of the Appellate Division." People ex rel. Long Acre Electric Light & Power Co. v. Public Service Commission, 199 N. Y. 254, 92 N. E. 629. It was not treated as a new proceeding either by the commission or the parties appearing before it. The record, which was before us for review under a writ of certiorari sued out by the Long Acre Company, was taken as the record for the further action of the commission (without requiring the consent of any of the parties), supplemented by the additional evidence taken on application of relator, over respondent's objection. Under the General Construction Law §§ 93, 94, and 95 (Consol. Laws 1909, c. 22), the repeal or amendment of a statute does not affect a pending proceeding, nor impair any act done, or right accruing, accrued, or acquired prior to such appeal or

amendment, unless otherwise specially provided by law. This proceeding had not only been pending for two years prior to the amendment of 1910, but the testimony had been closed and the application determined by the Public Service Commission on June 26, 1908 (almost two years prior to the amendment); and this court had reviewed the record and made its decision before June 14, 1910.

Proceedings such ·as those under review are not affected by subsequent legislation, which is not specifically made retroactive. The question is considered at length in the cases which called for the construction of the Grade Crossing Act of 1897 (Laws 1897, c. 754), repealing chapter 62 of the Laws of 1853. The Court of Appeals held that the repeal did not affect pending proceedings. People ex rel. City of Buffalo v. New York C. & H. R. R. R. Co., 156 N. Y. 570, 51 N. E. 312; People ex rel. City of Niagara Falls v. N. Y. C. & H. R. R. R. Co., 158 N. Y. 410, 53 N. E. 166; Geneva & Waterloo Railway Co. v. New York Cent. & H. R. R. Co., 163 N. Y. 228, 57 N. E. 498; Matter of Ludlow Street, 172 N. Y. 542, 65 N. E. 494. See, also, People ex rel. Provident Sav. Life Assur. Soc. v. Miller, 179 N. Y. 229, 71 N. E. 930; Village of Champlain v. McCrea, 165 N. Y. 264, 59 N. E. 83.

The case of People ex rel. Binghamton L., H. & P. Co. v. Stevens, 143 App. Div. 789, 128 N. Y. Supp. 440, cited by the relator, was reversed by the Court of Appeals (203 N. Y. 7, 96 N. E. 114); the court holding that:

"Wholly apart from the claim of the commission, this case must be determined upon the statute as it now ·exists, and assuming, for the purpose of what we are here saying, that the relator is right in claiming that this appeal must be determined upon the statute as it existed on the day when the original petition herein was filed, we are nevertheless of the opinion that it was the duty of the commission to determine whether the stock or bonds, proposed by the relator, were to secure money to pay floating indebtedness, incurred in the ordinary running expenses of the corporation." 203 N. Y. at page 22, 96 N. E. at page 118.

The amendment which was considered in that case did not, in respect of the matter before the court, "give to the commission new and theretofore nonexisting power." 203 N. Y. at page 25, 96 N. E. at page 119.

The amendment of 1910, which the relator seeks to apply to this proceeding, is urged, not only to have given the commission new and theretofore nonexisting power, but to have required allegations in the petition and proof entirely unnecessary when the proceedings were instituted. Indeed, if it were held that the amendment of 1910 applies to this proceeding, a serious question would arise as to its constitutionality. The respondent, as we held in the former review, had fully complied with all the provisions of the act of 1907. It was an active, operating company, in business for over two years prior to the passage of the amendment of 1910, making reports to the Public Service Commission and operating under its jurisdiction and supervision. It had not only fully complied with the provisions of section 68, but it was entitled to have the commission permit it to issue se-

curities under section 69, as we held, without a certificate of public necessity or convenience. The right to mortgage property to raise funds for construction and operation is a valuable property right (Pearsall v. Great Northern Ry. Co., 161 U. S. 648, 16 Sup. Ct. 705, 40 L. Ed. 838), and if the act of 1910 can be made to apply to the respondent, we have an active, operating corporation, possessing a valuable franchise, legislated out of business because of its failure or inability to secure a certificate of public necessity or convenience, when it applies for leave to mortgage its property and issue securities for purposes of operation. The statute which is general affects the entire state, and applies to every corporation exercising any rights under a gas or electric franchise. If the amendment of 1910 is to be construed to apply to operating companies and to proceedings under section 69, instituted in 1908, it would, in my opinion, render the statute unconstitutional in that it would deprive such corporations of vested rights and valuable property, without compensation, and without due process of law.

But even if under any permissible construction the act of 1910 can be said to apply to this proceeding, I am clearly of the opinion that the finding of the commission that the secondary franchise of the respondent was operated in 1889 and 1890 is sustained by the evidence.

[3] The amendment of 1910 provides for a certificate of public necessity and convenience, before any right or privilege is exercised "under any franchise hereafter granted, or under any franchise heretofore granted, but not heretofore exercised, or the exercise of which was suspended for more than one year." It is undisputed that the exercise of the secondary franchise of the respondent was not suspended for more than one year immediately prior to the passage of the amendment. It was actively and continuously exercised under the jurisdiction of the Public Service Commission since January, 1908. The construction of its plant and subsequent operation under the franchise were with the knowledge and acquiescence not only of the municipal authorities, but of the Public Service Commission. If any exercise of the franchise had been attempted or carried on, contrary to the provisions of law, the commission, under section 74 of the Public Service Act of 1907, could have prevented further action in a summary manner. The operation from 1908 was not only with the acquiescence and approval of the commission, to which annual reports were made, but, as we held, the respondent had fully complied with all the provisions of that act justifying an issue of additional securities to enlarge its operations. It is very clear that this franchise was not suspended for more than one year immediately prior to June 14, 1910, and no one will seriously contend that the provision of the act of 1910 in this respect applies to an active, operating company, which may, at some time in the distant past, have suspended operation for more than one year.

The contention is, however, that if the act of 1910 does apply, a certificate of public necessity and convenience is required because the secondary franchise was not "actually exercised" prior to 1907.

When the case was before us on the writ of certiorari of the Long Acre Company, we construed the act of 1907, which provided that:

"No gas corporation or electric corporation incorporated under the laws of this or any other state shall begin construction, or exercise any right or privilege under any right to franchise, hereafter granted, or under any franchise heretofore granted but not heretofore actually exercised, without first having obtained the permission and approval of the proper commission."

As this was a franchise which had been granted prior to 1907, the question for consideration was whether it was a franchise which had been "heretofore actually exercised," and we found that:

"The franchise under which the relator (Long Acre Company) seeks to operate its business did *not* fall within the class of franchises 'not heretofore actually exercised.'" 137 App. Div. at page 816, 122 N. Y. Supp. at page 646.

The additional evidence which has been offered by the respondent to meet that introduced by the relator shows to a demonstration actual operation in 1889 and 1890.

[4] In reviewing a finding of fact by the commission, we can only set it aside when there is such a preponderance of proof against the fact found that the verdict of a jury affirming the existence thereof would be set aside as against the weight of evidence. Code, § 2140. The fact of operation was found by every tribunal before which the question came for adjudication, since the commencement of the mandamus proceedings in 1906.

The secondary franchise granted to the American Electric Manufacturing Company in 1867 was acquired by the American Electric Illuminating Company in 1889. At that time the policy of the state was to prevent the erection of additional poles and wires over the surface of the streets, and provision had been made for the removal of all electrical conductors overhead, then in use, and for the construction of conduits or subways underground by the Consolidated Telegraph & Electrical Subway Company. Chapter 534, Laws of 1884; chapter 499, Laws of 1885; chapter 503, Laws of 1886; chapter 716, Laws of 1887. The American Electric Illuminating Company, therefore, could not exercise its franchise by erecting additional poles and wires. There was only one way in which this secondary franchise could be operated, and that was by leasing, or obtaining permission to use, existing poles and wires of another company. The Illuminating Company was controlled by one William H. Kelly, who also owned another electric light company, known as the East River Electric Light Company. Both companies were carrying on business on Twenty-Fourth street in the borough of Manhattan. In order to operate both secondary franchises, and not violate the statute, Kelly divided the territory so as to permit the East River Company to operate on the west side of the city, and the Illuminating Company to operate on the east side of the city from Twenty-Fourth street, through First avenue, Avenue A and Avenue B, and east through Houston street to Avenue C. In this territory, assigned to the Illuminating Company, every customer furnished with light was the customer of the Illuminating Company. This company had its own offices, its separate set of books, bills, bank accounts, sign on the building, and

its own electricians, bookkeepers, cashier, and officers. It made annual reports and was kept absolutely distinct from the East River Company, both in respect of all its business and of the territory in which it operated the secondary franchise.

The Illuminating Company had two dynamos, known as American machines, and its own lamps, which it affixed to the poles and wires of the East River Company in this territory. Its lamps were distinguishable from those used by the East River Company in its territory. The former being of the American, the latter of the Thomson-Houston, type. The electricity was manufactured and generated by the Illuminating Company with its own dynamos; the steam power being furnished by the East River Company. For this steam power and the use of the poles and wires, the Illuminating Company paid the East River Company an agreed sum. The bills for electricity sold by the Illuminating Company to its customers were collected by it, after rendering its accounts on its own billheads. It furnished to the city at least six free lamps in accordance with the terms of the franchises and carried on its business of manufacturing and selling electricity to its customers as though it owned the poles and wires. This continued for a period of 15 months, when all poles and wires were cut down, pursuant to the policy of the city, which brought on financial embarrassment for the company, necessitating a sale of its franchise, subsequently acquired, through mesne assignments, by the respondent. The learned counsel for the relator contends that the secondary franchise was not operated because the poles and wires did not belong to the respondent, and that manufacturing and generating electricity on the premises on Twenty-Fourth street, with its own dynamos, and the sale of electricity to its customers in the manner indicated, was not an operation by the respondent of the secondary franchise.

With this view I cannot agree. The franchise was operated in the only way possible at that time. Poles and wires could not be erected overhead, and there were no subway ducts through which cables could be carried. There was therefore only one method open for the Illuminating Company, and that was to hire, or secure the right to *use*, other and existing poles and wires of another company. The Illuminating Company had no right to carry its electricity through or over the streets or highways of New York unless it possessed a secondary franchise. To exercise that franchise it was not essential that it erect poles and wires. It could be done, as in this case, by renting or hiring the *use* of another company's poles and wires. It is not new in the law of railroads to have a franchise operated under trackage agreements or leases, over the lines, and with the cars of another company. The public is not concerned in the question of ownership of the rolling stock. All that the public is interested in is in having the service furnished it, which the owner of the franchise undertook to do when it applied for and accepted the franchise. So long as electricity was furnished to applicants or customers of the Illuminating Company by that corporation, it mattered not whether it was carried from the dynamos of the Illuminating Company to the premises of the consumer over its own poles and wires, or those

leased by it. The franchise included the right to *"use* wires  \*  \*  \* for electrical purposes, in the city of New York  \*  \*  \* over \*  \*  \* the streets  \*  \*  \* therein.  \*  \*  \*."

When respondent "used the wires" of the East River Company for its own "electrical purposes" to sell to its own customers the electricity it manufactured, it was operating within the letter and spirit of its franchise. The exercise of one or more of the rights accorded to it by the franchise was an operation which saved it from forfeiture for nonuser. It did not require the exercise of *all* of its rights and privileges.

"No corporation is required to exercise all the powers granted to it by its organic law as a condition of the exercise of some of them, unless that requirement is expressly made by some statute or ordinances under which it derives some of its powers or privileges, or the powers are inseparably connected with each other." Illinois Trust & Savings Bank v. Doud, 105 Fed. 123–129, 44 C. C. A. 389, 395 (52 L. R. A. 481).

Poles and wires were only a means used in those days for carrying electricity from the dynamos to the lamp of the consumer. They were not the primary objects of a franchise. At that time no other method was known of carrying the electric current to the consumer, and no one had a right to use the streets of New York to bring the current from the dynamo to the lamp, without a franchise for that purpose. The present method of conveying electricity is by means of the subway conduits, but those ducts are not owned by the electric companies selling their electricity to consumers. They are owned by the Consolidated Telegraph & Electrical Subway Company, and space must be *leased* or *hired* by the electrical companies. No space can be assigned to such company, however, unless it has a secondary franchise. I can see no difference, in law, between the process adopted in 1889, of hiring or renting the use of overhead poles and wires for the purpose of carrying electricity, and the present method of leasing or hiring space from the subway company for the same purpose. The one was the overhead conduit, and the other is the underground duct; but it was as much the operation of a secondary franchise in 1889, to send the electricity by means of leased overhead structures, as it is to-day by renting space in the subway conduits.

[5] If carrying electricity over the streets of New York for general sale to customers for light, heat, and power, by means of leased poles and wires, is not operation of a secondary franchise, and does not require a franchise, then it leads to this situation: A company, which, in 1889, owned poles and wires in the streets of New York or which now owns ducts or subways, could parcel out rights, equivalent to a secondary franchise, to any person, firm, or company applying therefor, by simply licensing or granting consent to use the wires or ducts for conduit purposes, and without limit as to the number who might be permitted to use those wires. Thus, any person by erecting an electrical plant upon his premises could engage in the business of supplying current for lighting purposes throughout the city, with the consent—not of the municipal authorities—but of the company owning the former poles and wires, or present ducts, and

create secondary franchises indefinitely. It therefore seems quite manifest that even if we were not bound by our former determination which limited the powers and duties of the commission, and even though we held the amendment of 1910 applicable to this proceeding, we would still be obliged to say, as we did before, that the franchise under which respondent operates its business does not fall within the class of franchises "not heretofore actually exercised."

I am of opinion therefore that the writ of certiorari should be dismissed, with costs, and the order of the Public Service Commission be affirmed.

CLARKE, J., concurs.

LAUGHLIN, J. (concurring). A certificate of necessity and convenience not being required, the relator was not entitled to introduce evidence on the question as to whether the respondent had actually exercised the secondary franchise, so called; but I am of opinion that the rehearing ordered by this court was not necessarily confined to the nature and amount of the securities to be issued, and that it was competent for the commission to reconsider the other questions which had been originally determined favorably to the respondent, and to receive further evidence thereon. On all other points, I fully concur in the views expressed by Mr. Justice DOWLING, and they require that the proceedings of the commission be confirmed and the writ dismissed.

MILLER, J. (dissenting). On the former appeal, this court held that the Public Service Commission erred in construing section 68 of the Public Service Commission Law (chapter 429 of the Laws of 1907), as requiring the applicant, hereinafter referred to as the respondent, to obtain the permission and approval of the commission before beginning construction, irrespective of whether the secondary franchise of the respondent had been exercised. 137 App. Div. 810, 122 N. Y. Supp. 641. The commission had assumed, without formally finding the fact to be, that said franchise had been exercised; but that assumption of fact was unimportant in view of the said erroneous construction of the statute. The order of this court, dated April 27, 1910, directed that the application be referred back to the commission "for consideration and action within the limits of its authority." Said section 68 was amended by chapter 480 of the Laws of 1910 (Consol. Laws 1910, c: 48), which went into effect June 14, 1910. Thereafter the relator was allowed to intervene, additional evidence was taken on the question of the prior exercises of said franchise, and a majority of the commission, apparently considering that they were concluded by our decision, made the order now before us for review.

A preliminary question is raised as to the relator's right to be heard. That depends on whether it is necessary for the respondent to obtain a certificate of public necessity and convenience, and that in turn depends upon the construction and effect of said amendment of 1910.

When the application herein was originally made, said section 68 read as follows:

"No gas corporation or electrical corporation incorporated under the laws of this or any other state shall begin construction, or exercise any right or privilege under any franchise hereafter granted, or under any franchise heretofore granted but not heretofore actually exercised without first having obtained the permission and approval of the proper commission."

As amended, it reads as follows:

"No gas corporation or electrical corporation shall begin construction of a gas plant or electrical plant without first having obtained the permission and approval of the commission of each district within which any part of the work of construction is to be performed. No such corporation shall exercise any right or privilege under any franchise hereafter granted, or under any franchise heretofore granted but not heretofore actually exercised, or the exercise of which shall have been suspended for more than one year, without first having obtained the permission and approval of the proper commission. * * * The commission within whose district such construction is to be made, or within whose district such right, privilege or franchise is to be exercised, shall have power to grant the permission and approval herein specified whenever it shall, after due hearing, determine that such construction or such exercise of the right, privilege, or franchise is necessary or convenient for the public service."

It is urged that, perforce of sections 93, 94, and 95 of the General Construction Law, this proceeding is saved from the effect of the amendment of 1910, and that it would give the amendment a retroactive effect to apply it to this proceeding. The provisions of the General Construction Law, referred to, in terms relate to repealing acts. The respondent cites a case in which it appears to have been assumed by the court that the said provisions apply to amendatory acts (G. & W. Ry. Co. v. N. Y. C. & H. R. R. Co., 163 N. Y. 226, 57 N. E. 498); but what the Court of Appeals really decided in that case was that the correctness of the decision before it for review should be determined by the law in effect when it was made. Of course, this application is strictly under section 69; but the steps required by section 68, before a corporation begins construction or the exercise of its secondary franchise, should be taken before consent is given to issue securities. The amendment of 1910 required additional steps to be taken, and we think that its application to the respondent is not affected by the fact that the latter had already filed an application for leave to issue securities. Matter of Ludlow Street, 172 N. Y. 542, 65 N. E. 494; People ex rel. Binghamton L., H. & P. Co. v. Stevens, 143 App. Div. 789, 128 N. Y. Supp. 440, reversed on another point 203 N. Y. 7, 96 N. E. 114.

It may be granted that the act of 1910 will not be given a retroactive effect; i. e., that it will not apply to a corporation which had lawfully begun construction and the exercise of its secondary franchise when it was passed. It is undisputed that the respondent had not begun construction of its plant or the exercise of the secondary franchise acquired by it when the act of 1907 was passed. It appears to be assumed by both sides that, since that time, the respondent has begun construction and the exercise of the secondary franchise, and the evidence discloses that it has constructed what might be termed

an embryo plant, that space in the subway ducts has been assigned to it, that subsidiary ducts or house connections have been made for it, that permission has been granted by the municipal authorities to draw in its cables, and that it is supplying electricity to at least one customer who occupies a building with it. If it be assumed that that constitutes the exercise of the secondary franchise, the question remains whether it was lawfully done, and that depends on whether the permission and approval of the commission was necessary under the [act of 1907, which in turn depends on whether the secondary franchise had theretofore been exercised.

It is urged, however, that the effect of our order was to remit the proceedings to the commission with instructions to determine the amount of securities to be authorized, and the conditions under which they were to be issued. We do not so construe the order. So far from restricting the authority of the commission on the rehearing, it expressly directed the commission to proceed, "within the limits of its authority," which of course means the authority conferred by law.

The undisputed evidence on the first hearing before the commission tended to show that in 1889 and 1890 the American Electric Illuminating Company, the then owner of said franchise, owned and maintained wires and poles in the streets of the city and manufactured electricity and transmitted it over said wires to a number of customers. The only witness who testified from personal knowledge on the subject was called on the rehearing and retracted his testimony, saying that he confused the American Electric Illuminating Company with the East River Electric Light Company. The respondent in rebuttal called Mr. Townsend, to whom the franchise had been assigned by the American Electric Manufacturing Company, and who in turn assigned it to the American Electric Illuminating Company, of which he was president. We shall accept his testimony on the subject. The franchise was assigned by him to the American Electric Illuminating Company on the 19th of April, 1889. At that time, the East River Electric Light Company owned and operated an electric light plant and maintained wires and poles in the streets. Said two companies were owned and controlled by the same persons. The American Electric Illuminating Company, in addition to its secondary franchise, acquired 2 dynamos and 100 lamps. The dynamos were installed in the building occupied by the East River Company. They were run by the power furnished by the latter company. Electricity from them was transmitted over the wires of the latter company to a number of the latter's former customers. Separate sets of books, however, were kept by each company. The American Electric Illuminating Company had its own sign, its own letter and billheads, and the bills to customers supplied with electricity generated by the two dynamos, owned by it, were rendered in its name. All of the employés, however, including collectors, were on the pay roll of the East River Company. Collections, when made, were turned over to the latter and deposited in its bank account; but a bookkeeping entry was made on the books, crediting the Illuminating Company with the amount of the collections and charging against it the expense of operation. There was no writ-

ten agreement between the two companies, not even a lease by the Illuminating Company of the wires and poles of the East River Company, and the only arrangement between them consisted of a direction given by the man who controlled both companies to Townsend to make the bookkeeping entries.

The franchise in question, granted by the board of aldermen on May 31, 1887, gave permission and authority:

"To locate and erect poles and hang wires and fixtures thereon, and to place, construct, and use wires, conduits and conductors for electrical purposes, in the city of New York, in, over and under the streets, avenues, wharves, piers and parks therein, or adjacent thereto; according to such plans as may be directed, approved or allowed by and subject to the powers of the electrical subway commissioners, and to the provisions of chapter 499 of the Laws of 1885, and under the supervision of the commissioner of public works and of the department of public parks. * * *"

Said chapter 499 provided for the appointment of a board of commissioners of electrical subways, made it the duty of said board to cause to be removed from the surface, wherever practicable, all electric wires or cables, required the approval of said board to the construction of subway conduits and its permission to the construction of aërial lines, to be granted only "when and where the public necessity does not require the electrical ducts to be placed underground, or when or where it shall be deemed by the board itself impracticable to place and operate the conductors advantageously underground as aforesaid." Said board was by chapter 716 of the Laws of 1887 constituted the board of electrical control. Said act made it unlawful, without permission of said board, to continue, construct, erect, maintain, or string above ground in any part of the city, electrical conductors, poles, or other fixtures or devices therefor, or any wires, and provided that the board of electrical control "may establish, and from time to time may alter, add to or amend all proper and necessary rules, regulations and provisions for the manner of use and management of the electrical conductors, and of the conduits or subways therefor constructed or contemplated under the provisions of this act, or of any act herein mentioned." Among other rules adopted by said board was the following:

"The companies or persons owning or controlling the poles in any street or avenue shall allow the same to be used by other persons operating conductors for a similar electrical service when authorized so to do by the board, on tender of proper compensation, to be determined by agreement between the parties interested."

It is not pretended that the said American Electric Illuminating Company ever obtained permission from the board of electrical control, or its predecessor, the commissioners of electrical subways, to leave the poles of the East River Company, or to erect poles and string wires in the streets in which these poles were. Indeed, no permit in any way applicable to the pretended exercise of the franchise appears to have been applied for or obtained.

It is difficult to understand how the privilege of constructing and using wires, conduits, and conductors "according to such plans as

may be directed, provided or allowed by and subject to the powers of the Electrical Subway Commission," could have been exercised without either constructing such wires, conduits, or conductors, or even submitting plans therefor to said board for its approval. The purpose of keeping the books of the East River Company and of the American Electric Illuminating Company in the manner described is patent. The owner of the said franchise thought that in that way he could establish the exercise of it and thus preserve it. It is said that a certain number of free lamps were furnished the city; but there was nothing to apprise the latter that these were not the lamps of the East River Company. The truth is that the business was conducted by the latter company. Its servants attended to every detail of operation, even to the collection of the bills. It paid all the expenses, and all of the collections went into its treasury. The other company did nothing except to keep a set of books; but the making of secret bookkeeping entries did not constitute the exercise of a franchise to place, construct, or use wires, conduits, and conductors for electrical purposes in the streets, according to plans approved by the board of electrical subway commissioners.

But even if the American Electric Illuminating Company had leased the wires and poles of the East River Company, and had in fact transmitted electricity over said wires, the respondent would still be far from showing the exercise of the said franchise. The right to have the wires and poles in the streets and to transmit electricity over the wires was exercised, if at all, under the franchise of the East River Company. Two secondary franchises were not required for that purpose. The American Electric Illuminating Company could have made use of the franchise of the East River Company without a secondary franchise of its own, and it certainly could have done everything that the evidence in this case shows it did do, without any franchise at all. The conclusion therefore seems irresistible that the secondary franchise in question was never exercised prior to 1907. It was therefore necessary for the respondent to obtain permission and authority of the commission before beginning construction. Wherefore its acts subsequent to 1907 were unlawful, and it is now in the position of never having lawfully begun the construction of its plant or the exercise of its secondary franchise, and it is necessary for it to take the steps required by said section 68, as amended, before permission should be given it to issue securities.

The determination should be annulled and the proceedings remitted to the commission.

INGRAHAM, P. J., concurs.